1 │ GEORGE M. NEWCOMBE (Bar. No. 202898)
  │ gnewcombe@stblaw.com
2 │ JAMES G. KREISSMAN (Bar No. 206740)
  │ jkreissman@stblaw.com
3 │ SIMPSON THACHER & BARTLETT LLP
  │ 2550 Hanover Street
4 │ Palo Alto, California  94304
  │ Telephone: (650) 251-5000
5 │ Facsimile:  (650) 251-5002

**ORIGINAL**
**F I L E D**

FEB 2 7 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

6 │ Attorneys for Defendants Richard S. Fuld,
  │ Jr., Christopher M. O'Meara, Joseph M.
7 │ Gregory, Ian Lowitt, David Goldfarb, John
  │ F. Akers, Roger S. Berlind, Marsha Johnson
8 │ Evans, Roland A. Hernandez and Henry
  │ Kaufman
9 │

**SI**

10 │
11 │                UNITED STATES DISTRICT COURT
12 │         FOR THE NORTHERN DISTRICT OF CALIFORNIA
13 │                 SAN FRANCISCO DIVISION

**CV 09        0875**

14 │ CITY OF AUBURN,
15 │                                          09 Civ. _____
   │                Plaintiff,
16 │        v.                                Removed from:
17 │ RICHARD S. FULD, JR., CHRISTOPHER M.     Superior Court of the State of California,
   │ O'MEARA, JOSEPH M. GREGORY, ERIN         County of San Francisco
18 │ CALLAN, IAN LOWITT, DAVID GOLDFARB,
   │ JOHN F. AKERS, ROGER S. BERLIND,         Civil No. CGC-09-485137
19 │ MARSHA JOHNSON EVANS, ROLAND A.
   │ HERNANDEZ, HENRY KAUFMAN, ERNST &
20 │ YOUNG LLP, and DOES 1 through 20,        **NOTICE OF REMOVAL**
21 │                Defendants.
22 │
23 │        PLEASE TAKE NOTICE that Defendants Richard S. Fuld, Jr., Christopher M.
24 │ O'Meara, Joseph M. Gregory, Ian Lowitt, David Goldfarb, John F. Akers, Roger S. Berlind,
25 │ Marsha Johnson Evans, Roland A. Hernandez and Henry Kaufman (collectively, the "Removing
26 │ Defendants"), pursuant to 28 U.S.C. §§ 1334(b), 1367, 1441, 1446 and 1452, hereby remove the
27 │ entire above-captioned civil action, and all claims and causes of action therein, from the Superior
28 │

Court of the State of California, County of San Francisco, to the United States District Court for

the Northern District of California, San Francisco Division.[1]

As grounds for removal, Removing Defendants state as follows:

1.    On or about February 19, 2009, Plaintiff City of Auburn filed this action in the

Superior Court of the State of California, San Francisco County.  This case was assigned an index

number of CGC-09-485137.[2]

2.    On February 25, 2009, counsel for Removing Defendants informed counsel for

Plaintiff that Removing Defendants were willing to accept service of the summons and complaint

in this action.

3.    This Notice is being timely filed under 28 U.S.C. § 1446(b).

4.    The other defendants named in this action – Erin Callan and Ernst & Young LLP –

consent to this Notice and seek the removal of this action to the United States District Court for

the Northern District of California, San Francisco Division.

5.    Plaintiff City of Auburn alleges that it invested in two notes from Lehman Brothers

Holdings Inc. ("Lehman"), and suffered "substantial" losses on such investments as a result of

Defendants' wrongful conduct relating to the securities.  *See* Complaint ¶ 23.  Plaintiff alleges that

it purchased the Lehman securities in reliance on Defendants' misrepresentations and omissions.

Complaint ¶¶ 23, 54.  Plaintiff asserts causes of action for fraud and deceit, negligent

misrepresentation, breach of fiduciary duty, violations of California Corporations Code § 25400,

and violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  *See*

Complaint ¶¶ 161-205.

6.    Removal is appropriate here because this Court maintains bankruptcy "related to"

jurisdiction, pursuant to 28 U.S.C. §§ 1334(b) and 1452(a), and supplemental jurisdiction under 28

[1]    By removing this matter, Removing Defendants do not waive, and expressly preserve, any and all defenses that they may have, including, but not limited to, lack of personal jurisdiction.

[2]    This action is similar to other actions that the Judicial Panel on Multidistrict Litigation ("JPML") has centralized in the Southern District of New York.  Defendants expect that the JPML will transfer this action to the Southern District of New York as well.

U.S.C. § 1367 for any claims or parties not subject to jurisdiction under § 1334.

**Bankruptcy "Related To" Jurisdiction**

7.     On September 15, 2008, Lehman Brothers Holdings Inc. ("Lehman"), the issuer of the securities that are the subject of this action and the corporation for which the Individual Defendants serve or served as officers or directors, filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555, *et seq.* (the "Lehman Bankruptcy Proceedings"). *See* Complaint ¶ 15.  The Lehman Bankruptcy Proceedings are currently pending before U.S. Bankruptcy Judge James M. Peck.

8.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), which provides that United States district courts shall have jurisdiction over all civil proceedings, *inter alia*, "related to cases under title 11 [the United States Bankruptcy Code]". This action may be removed to this Court by Defendants under 28 U.S.C. § 1452(a), which provides for removal of an action to a district court if it has original jurisdiction under section 1334, because this action is "related to" a case under Chapter 11, namely the Lehman Bankruptcy Proceedings.

9.     This action is "related to" the Lehman Bankruptcy Proceedings, and therefore removable to this Court pursuant to 28 U.S.C. § 1452(a), because the outcome of this case will have a conceivable effect on the Lehman bankruptcy estate.  An action is "related to" a bankruptcy proceeding if "*the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *In re Feitz*, 852 F.2d 455, 457 (9th Cir.1988) (emphasis in original) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test . . . is whether [the litigation's] outcome might have any 'conceivable effect' on the bankrupt estate.").

10.     An action is "related to" a bankruptcy proceeding even when the claims are between third parties. *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) (resolving a circuit split by holding that a dispute between parties other than the debtor may be "related to" bankruptcy

although the debtor has no interest in the property over which the parties are in dispute).

11.     This action relates to Lehman's bankruptcy rights because (i) Lehman was the issuer of the securities that are the subject of the action, (ii) certain Defendants have claims to indemnification for defense costs and expenses from Lehman in the event a judgment is entered against them in this action, (iii) at least certain, if not all, Defendants have claims to contribution from Lehman in the event a judgment is entered against them in this action, and (iv) certain Defendants have rights to coverage under directors and officers insurance policies issued to Lehman.

12.     Courts have regularly found that third party proceedings are "related to" bankruptcy proceedings when the defendants have a claim for indemnification or contribution against the debtor estate or a claim to coverage under insurance provided by the bankrupt corporation, even where their rights are contingent or merely potential. *See Carpenters Pension Trust For Southern California v. Ebbers*, 299 B.R. 610, 612-13 (C.D. Cal. 2003) (denying motion to remand and finding potential for indemnification claims against bankruptcy estate sufficed for "related to" jurisdiction); *Pacific Life Ins. Co. v. J.P. Morgan Chase & Co.*, No. 03-CV-813, 2003 WL 22025158, at *1 (C.D. Cal. June 30, 2003) (holding that claims of contribution and indemnification, even where contingent, established "related to" jurisdiction); *In re Worldcom, Inc. Secs. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003) ("Because the effect of contribution claims on the bankruptcy estate is at the very least 'conceivable,' the . . . action is related to the bankruptcy and subject to the jurisdiction of this Court."); *Kennilworth Partners II LP v. Crisman*, No. 00-CV-3218, 2001 WL 30534, at *3 (N.D. Cal. Jan. 3, 2001) (holding that case is "related to" a bankruptcy where "any recovery by plaintiff would be subject to defendants' indemnification claims under [the bankrupt corporation's] by laws and claims for coverage under the [bankrupt] corporation's directors and officers insurance policy); *In re Sizzler Rests. Intl., Inc.*, 262 B.R. 811, 818-819 (Bankr. C.D. Cal. 2001) (holding that employee indemnification provides an adequate basis for "related to" jurisdiction even though indemnification was conditioned on a subsequent proceeding); *In re Masterwear Corp.*, 241 B.R. 511, 516-17 (Bankr. S.D.N.Y. 1999) (holding that

"related to" jurisdiction existed where defendants "may ultimately be entitled to recover some or all of their legal fees and expenses from [the bankrupt corporation] under [its] bylaws").

13.     For any claims or parties not subject to jurisdiction under 28 U.S.C. § 1334, supplemental jurisdiction lies under 28 U.S.C. § 1367 because all claims against all parties in this case form part of the same case or controversy.

**Other Procedural Requirements**

14.     This is not a core proceeding under 28 U.S.C. § 157(b).  Removing Defendants do not consent to entry of final orders or judgment by any bankruptcy judge.

15.     Exhibit A includes a copy of all process, pleadings, and orders served upon Removing Defendants, pursuant to 28 U.S.C. § 1446(a).

16.     Removing Defendants will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Superior Court of the State of California, San Francisco County, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

17.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11 and Bankruptcy Rule 9011.

WHEREFORE, the Removing Defendants remove this action in its entirety from the Superior Court of the State of California, San Francisco County to the United States District Court for the Northern District of California, San Francisco Division.

Dated: February 27, 2009

SIMPSON THACHER & BARTLETT LLP

By _____
James G. Kreissman
*Attorneys for Removing Defendants Richard S. Fuld, Jr., Christopher M. O'Meara, Joseph M. Gregory, Ian Lowitt, David Goldfarb, John F. Akers, Roger S. Berlind, Marsha Johnson Evans, Roland A. Hernandez and Henry Kaufman*

📎 JS 44  (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| City of Auburn | Richard S. Fuld, Jr. et al. |

| (b)  County of Residence of First Listed Plaintiff  San Francisco<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
|---|---|

| (c)  Attorney's (Firm Name, Address, and Telephone Number)<br><br>See Attachment | Attorneys (If Known)<br><br>See Attachment |
|---|---|

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **IMMIGRATION** | **FEDERAL TAX SUITS** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus – Alien Detainee<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1  Original Proceeding

☒ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Section 77a et seq.
Brief description of cause:
Action under Sections 11 and 15 of the Securities Act of 1933

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".   See Attachment

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND       ☐ SAN JOSE

DATE
02/27/09

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse  (Rev. 12/07)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**       Example:       U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.

**I(c).**

Attorneys for Plaintiff:     COTCHETT, PITRE & MCCARTHY
Joseph W. Cotchett
Mark C. Molumphy
Nanci E. Nishimura
Gerald S. Ohn
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000

Attorneys for Defendants:     SIMPSON THACHER & BARTLETT LLP
George M. Newcombe
James G. Kreissman
2550 Hanover Street
Palo Alto, CA 94304
(650) 251-5000
*Attorneys for Removing Defendants Richard S. Fuld, Jr.,*
*Christopher M. O'Meara, Joseph M. Gregory, Ian Lowitt, David*
*Goldfarb, John F. Akers, Roger S. Berlind, Marsha Johnson*
*Evans, Roland A. Hernandez and Henry Kaufman*

**VIII.**

Related Cases:     *Solton v. Fuld, et al.*, No. C 08-5617 SC

*City of S. San Francisco v. Citigroup Global Markets, Inc.*, No. C
09-501 MMC

# Exhibit A

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000    FAX NO. *(Optional):* 650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served):* Richard S. Fuld, Jr.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
(TYPE OR PRINT NAME)    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient):*
Date this form is signed:    February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Defendant Richard S. Fuld, Jr.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10 |
|---|---|---|

Page 1 of 1

Legal Solutions Plus

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577<br>E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*: Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-458137 |
|---|---|

TO *(insert name of party being served)*: Christopher M. O'Meara

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
(TYPE OR PRINT NAME)                           ▶                           (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheete; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient)*:
Date this form is signed:   February 25, 2009
  Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP                           ▶
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,                           (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                           ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
                                                           Attorney for Defendant Christopher M. O'Meara
                                                                                                         Page 1 of 1

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL                           Legal
                                                                      Solutions
                                                                      ⓖ Plus
                           Code of Civil Procedure,
                           §§ 415.30, 417.10

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>  TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional):*   650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>  ATTORNEY FOR *(Name):* Plaintiff | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
  STREET ADDRESS: 400 McAllister Street
  MAILING ADDRESS:
  CITY AND ZIP CODE: San Francisco, CA 94102
  BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served):* Joseph M. Gregory

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
         (TYPE OR PRINT NAME)              ►              (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet


*(To be completed by recipient):*
Date this form is signed:    February 25, 2009
  Eric M. Albert, Esq.
  Simpson Thacher & Bartlett LLP
      (TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
       ON WHOSE BEHALF THIS FORM IS SIGNED)              ►              (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
                                                              ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
                                                              Attorney for Defendant Joseph M. Gregory
                                                                                                          Page 1 of 1

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Legal
Solutions
Plus

Code of Civil Procedure,
§§ 415.30, 417.10

POS-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>   TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional):*   650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>   ATTORNEY FOR *(Name):* Plaintiff | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
   STREET ADDRESS: 400 McAllister Street
   MAILING ADDRESS:
   CITY AND ZIP CODE: San Francisco, CA 94102
   BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served):* Ian Lowitt

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: February 23, 2009

Gerald S. Ohn                                    ►
    (TYPE OR PRINT NAME)                              (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. ☒ A copy of the summons and of the complaint.
2. ☒ Other: *(specify):* Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient):*
Date this form is signed:   February 25, 2009
    Eric M. Albert, Esq.                             ►
Simpson Thacher & Bartlett LLP
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,        (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
   ON WHOSE BEHALF THIS FORM IS SIGNED)                  ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
                                                      Attorney for Defendant Ian Lowitt

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>ⓒ Plus |

Page 1 of 1

Code of Civil Procedure,
§§ 415.30, 417.10

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577<br>E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*: Plaintiff | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
    STREET ADDRESS: 400 McAllister Street
    MAILING ADDRESS:
    CITY AND ZIP CODE: San Francisco, CA 94102
    BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served)*: John F. Akers

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: February 23, 2009

Gerald S. Ohn
    (TYPE OR PRINT NAME)    ▶    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient)*:
Date this form is signed: February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
    (TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
    ON WHOSE BEHALF THIS FORM IS SIGNED)    ▶    (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
    ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
    Attorney for Defendant John F. Akers

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Code of Civil Procedure,
§§ 415.30, 417.10

Legal
Solutions
Plus

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional):*  650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco |
|---|
| STREET ADDRESS: 400 McAllister Street |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: San Francisco, CA 94102 |
| BRANCH NAME: Civil Division |

| PLAINTIFF/PETITIONER: City of Auburn |
|---|
| DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al. |

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served):* Roger S. Berlind

---

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
(TYPE OR PRINT NAME)        ▶              (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

**(To be completed by recipient):**
Date this form is signed: February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)        ▶              (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Defendant Roger S. Berlind

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>Page 1 of 1 |
|---|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional):* 650-697-0577<br>E-MAIL ADDRESS *(Optional):* mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name):* Plaintiff | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served):* <u>Marsha Johnson Evans</u>

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

<u>Gerald S. Ohn</u>
(TYPE OR PRINT NAME)                    ► (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify):* Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient):*
Date this form is signed: February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)        ► (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Defendant Marsha Johnson Evans

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal<br>Solutions<br>℗ Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382) <br> Cotchett Pitre & McCarthy <br> 840 Malcolm Road <br> Burlingame, CA 94010 <br><br> TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577 <br> E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com <br> ATTORNEY FOR *(Name)*: Plaintiff | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: <br> CGC-09-458137 |
|---|---|

TO *(insert name of party being served)*: Roland A. Hernandez

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
(TYPE OR PRINT NAME)          ▶          (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. ☒ A copy of the summons and of the complaint.
2. ☒ Other: *(specify)*: Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient)*:
Date this form is signed: February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,          ▶          (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                         ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
                                                             Attorney for Defendant Roland A. Hernandez

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Legal <br> Solutions <br> Plus | Code of Civil Procedure, <br> §§ 415.30, 417.10 <br> Page 1 of 1 |

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)
Cotchett Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010

TELEPHONE NO.: 650-697-6000   FAX NO. *(Optional)*: 650-697-0577
E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com
ATTORNEY FOR *(Name)*: Plaintiff

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: CGC-09-485137 |
|---|---|

TO *(insert name of party being served)*: Henry Kaufman

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

Gerald S. Ohn
_____
(TYPE OR PRINT NAME)                    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case Cover Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient)*:
Date this form is signed: February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,        (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)        ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Defendant Henry Kaufman

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]
NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL
Code of Civil Procedure,
§§ 415.30, 417.10
Page 1 of 1


Legal Solutions Plus

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark C. Molumphy (168009)/ Gerald S. Ohn (217382)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road<br>Burlingame, CA 94010<br><br>TELEPHONE NO.: 650-697-6000    FAX NO. *(Optional)*:  650-697-0577<br>E-MAIL ADDRESS *(Optional)*: mmolumphy@cpmlegal.com<br>ATTORNEY FOR *(Name)*: Plaintiff | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: City of Auburn

DEFENDANT/RESPONDENT: Richard S. Fuld, Jr., et al.

| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CGC-09-485137 |
|---|---|

TO *(insert name of party being served)*: <u>David Goldfarb</u>

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: February 23, 2009

<u>Gerald S. Ohn</u>
(TYPE OR PRINT NAME)    ▶    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. [X] A copy of the summons and of the complaint.
2. [X] Other: *(specify)*: Civil Case COver Sheet; Notice of Case Management Conference; and ADR Court Packet

*(To be completed by recipient)*:
Date this form is signed:  February 25, 2009
Eric M. Albert, Esq.
Simpson Thacher & Bartlett LLP    ▶
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,    (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)    ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Attorney for Defendant David Goldfarb

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Legal<br>Solutions<br>Plus | Code of Civil Procedure,<br>§§ 415.30, 417.10 |
|---|---|---|---|

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Richard S. Fuld, Jr.; Christopher M. O'Meara; Joseph
M. Gregory; Erin Callan; Ian Lowitt; David Goldfarb;
John F. Akers; Roger S. Berlind; Marsha Johnson
Evans; Roland A. Hernandez; Henry Kaufman, Ernst &
Young LLP, Does 1 through 20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
City of Auburn

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

CASE NUMBER:
*(Número del Caso):* 09-485137

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Francisco Superior Court
400 McAllister Street

San Francisco, CA 94102
Civil Department

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark C. Molumphy (168009)          650-697-6000     650-697-0577
Cotchett Pitre & McCarthy
840 Malcolm Road, Ste. 200
Burlingame, CA 94010

DATE:
*(Fecha)* FEB 1 9 2009          Clerk, by CRISTINA F BAUTISTA , Deputy
                                  *(Secretario)*                   *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**



Code of Civil Procedure §§ 412.20, 465

1  JOSEPH W. COTCHETT (36324)
    MARK C. MOLUMPHY (168009)
2  NANCI E. NISHIMURA (152621)
    GERALD S. OHN (217382)
3  **COTCHETT, PITRE & McCARTHY**
    840 Malcolm Road, Suite 200
4  Burlingame, California 94010
    Telephone: (650) 697-6000
5  Fax: (650) 697-0577
6  *Attorneys for Plaintiff City of Auburn*

7

                ENDORSED
                FILED
          Superior Court of California

    FEB 1 9 2009

    GORDON ... Clerk
    BY:___

JUL 4 2009 - 9⁰⁰ AM

8       **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9         **IN AND FOR THE COUNTY OF SAN FRANCISCO**

                  **DEPARTMENT 212**

10               **CGC - 09 - 485137**

| | |
|---|---|
| 11  CITY OF AUBURN, | CIVIL ACTION NO.: |
| 12          Plaintiff, | **COMPLAINT FOR:** |
| 13  vs. | 1.  Fraud and Deceit |
| 14  RICHARD S. FULD, JR., | 2.  Negligent Misrepresentation |
|     CHRISTOPHER M. O'MEARA, | |
| 15  JOSEPH M. GREGORY, | 3.  Breach of Fiduciary Duty |
|     ERIN CALLAN, | |
| 16  IAN LOWITT, | 4.  Violations of Calif. Corp. Code § |
|     DAVID GOLDFARB, |     25400 *et seq.*; |
| 17  JOHN F. AKERS, | |
|     ROGER S. BERLIND, | 5.  Violation of § 11 of the Securities Act |
| 18  MARSHA JOHNSON EVANS, | |
|     ROLAND A. HERNANDEZ, | 6.  Violation of § 15 of the Securities Act |
| 19  HENRY KAUFMAN, | |
|     ERNST & YOUNG LLP, | |
| 20  and DOES 1 through 20, | **JURY TRIAL DEMANDED** |
| 21          Defendants. | |

22

23

24

25

26

27

28

  LAW OFFICES
  COTCHETT,
    PITRE &
  McCARTHY

                    Complaint

**TABLE OF CONTENTS**

page

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             1.    Officer Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             2.    Finance and Risk Committee Defendants . . . . . . . . . . . . . . . . . . 10

       C.    Auditor Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       D.    Doe Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       E.    Agents and Co-Actors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       F.    Unnamed Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A.    The City And Its Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

             1.    State Law Authority And Requirements . . . . . . . . . . . . . . . . . . . 12

             2.    The Structure And Investment Policy Of The City . . . . . . . . . . . . 13

       B.    The Development of The Mortgage Securitization Industry . . . . . . . . . . . 14

             1.    Increasing Use of Sub-Prime Loans . . . . . . . . . . . . . . . . . . . . . . . 14

             2.    The Practice Of Pooling Risky Mortgages As A Security . . . . . . . . . . 16

       C.    Lehman's Emerges As The Industry Leader In Mortgage-Backed Securities . . . 17

       D.    As the Mortgage Market Deteriorates, Lehman's Risk Exposure Multiplies . . . 20

       E.    Lehman's SEC Filings And Related Market Reports, Reviewed And Audited by
             E&Y, Failed To Disclose Lehman's Increasing Exposure To Mortgage-Related
             Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       F.    The Central Role Of Ernst & Young . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

V.    CAUSES OF ACTION ......................................................... 47

FIRST CAUSE OF ACTION
      (Fraud and Deceit) ........................................................ 47

SECOND CAUSE OF ACTION
      (Negligent Misrepresentation) ............................................. 48

THIRD CAUSE OF ACTION
      (Breach of Fiduciary Duty) ................................................ 50

FOURTH CAUSE OF ACTION
      (Violation of California Corporations Code § 25400 et seq.) .................. 51

FIFTH CAUSE OF ACTION
      (Violations of Section 11 of the Securities Act) ........................... 52

SIXTH CAUSE OF ACTION
      (For Violations of Section 15 of the Securities Act) ....................... 53

VI.   PRAYER FOR RELIEF ........................................................ 54

VII.  DEMAND FOR JURY TRIAL .................................................... 54

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

Complaint

1     Plaintiff **City of Auburn** ("Plaintiff" or the "City") alleges the following based on the

2  investigation conducted by the City and its counsel, a review and analysis of **Lehman Brothers**

3  **Holdings, Inc.'s** ("Lehman" or the "Company") and **Ernst & Young LLP's** ("E&Y") filings

4  with the United States Securities and Exchange Commission (the "SEC"), news articles and

5  other media reports, press releases, interviews, and other matters of record.

6  I.     **INTRODUCTION**

7                                  **OVERVIEW**

8     1.     This case represents the worst example of the fraud committed by modern day

9  robber barons of Wall Street, who targeted public entities to finance their risky practices and then

10  paid themselves hundreds of millions of dollars in compensation while their companies

11  deteriorated. At Lehman, as investors like the City were losing billions, Chief Executive Officer

12  Richard Fuld reportedly took out almost **$500 million**, purchasing a lavish **multi-million dollar**

13  **home** (10,000 sq. ft.) in Greenwich, Connecticut, a **$21 million** apartment on Park Avenue in

14  New York, a **$13 million** beachfront vacation home in Florida, a **million dollar** ski house in Sun

15  Valley, Idaho, and a **multi-million dollar** art collection. Others in Lehman's executive

16  management took out lucrative bonuses paid in the years before the Company's collapse, while

17  committing a fraud. Lehman had the audacity to ask the U.S. Taxpayers for assistance in

18  September 2008, just before filing for bankruptcy.

19                                 **THE SCHEME**

20     2.     As described herein, **Lehman**, aided and abetted by its **Executives**, the Individual

21  Defendants herein, and its long-time auditor, **E&Y**, were able to raise billions of dollars from

22  investors and continue to artificially inflate the value of its bonds by concealing Lehman's

23  increasingly dangerous exposure from its low grade mortgage portfolio and its refusal to properly

24  value its assets. Quite the contrary, Defendants repeatedly distinguished Lehman from other

25  firms by emphasizing its strong capital base and superior risk management practices.

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

3.     Lehman was a major participant in the mortgage and real estate markets, originating residential and commercial mortgages, securitizing loans, marketing various asset-backed instruments, and investing directly in real estate. However, Lehman knew as early as 2005 that trouble was ahead given its sub-prime real estate exposure.

4.     In 2006 and 2007, the real estate and mortgage markets were in the midst of an unprecedented meltdown that adversely affected the market value of real estate and mortgage assets. Hundreds of companies with mortgage exposure, like Citigroup, Merrill Lynch, Morgan Stanley, Bear Stearns, and UBS, booked enormous gross losses related to their mortgage assets and the credit squeeze in 2007. For example, in June 2007, Bear Stearns announced that it would provide $3.2 billion to two of its hedge funds after they experienced significant mortgage-related losses. Those funds collapsed in July after incurring additional losses on their mortgage positions.

5.     However, Lehman's 2006 and 2007 financial reports, signed off by E&Y, hid the Company's exposure to mortgage-related losses. For instance, despite the severe conditions in the real estate and mortgage markets during the second quarter of 2007 (ending May 31, 2007), Lehman's SEC filings disclosed no gross writedowns of its real estate and mortgage-related assets during the quarter, but instead reported that the Company increased its holdings of such assets. Likewise, when reporting its third quarter 2007 results on September 18, 2007, Lehman failed to disclose material information regarding its internal gross writedowns of its real estate mortgage portfolio. When specifically asked for a breakdown of the gross versus net writedowns associated with the mortgage assets, Defendant Christopher O'Meara, the Chief Financial Officer at the time, refused to provide the information: "[K]nowing the gross numbers particularly in that business, I don't think is really a meaningful thing."

6.     Lehman's lack of disclosure and false reports were particularly misleading with respect to its exposure to so-called "Alt-A" investments. The term "Alt-A" is supposed to describe a mortgage that has a risk profile between prime and subprime. However, Lehman's Alt-A portfolio was largely comprised of high-risk loans that did not resemble conventional Alt-

1   A loans and were in fact more similar to subprime. Lehman's reports disclosed no meaningful

2   information about its Alt-A portfolio. Even when Lehman, in its Form 10-Q for the first quarter

3   of 2008, first included a separate line item for "Alt-A," it lumped together Alt-A holdings with

4   "prime" holdings.

5          7.       Lehman, through its Executives, claimed that its superior risk management

6   practices "hedged" against losses in its real estate and mortgage portfolio. However, the

7   defendants disclosed no meaningful information about its supposed "economic hedges" – such as

8   how much of its portfolio the Company had hedged, the dollar amount of total holdings, what

9   percentage was hedged, and the specific financial instruments used to hedge mortgage-backed

10  assets. In truth, Lehman's "economic hedges" presented an undisclosed risk of additional losses

11  from the hedges themselves.

12         8.       Lehman, through its Executives, and with the consent of E&Y, knowingly took

13  inadequate writedowns and claimed superior risk management practices. Lehman reported

14  record profits for fiscal year 2007, including net income of $877 million for the fourth quarter of

15  2007, and with the knowledge of E&Y, gave lucrative bonuses to its Executives. The

16  Defendants also raised over $30 billion from investors through offerings of debt and equity

17  securities. Unlike a retail bank, Lehman, as an investment bank, did not have a large deposit

18  base and had to raise capital from independent sources for investment and liquidity purposes to

19  replace losses. After raising approximately $1.9 billion in a preferred share offering that "took

20  care of our full-year needs," shortly thereafter, Lehman raised an additional $4 billion through a

21  preferred share offering in April 2008.

22                          **INTERNAL WARNINGS**

23         9.       Internally, Lehman's executives acknowledged that warning signs were

24  evident and that management had not moved "early/fast enough." An internal presentation, for

25  example, indicated that "[v]ery few of the top financial issuers have been able to escape damage

26  from the subprime fallout" and warned that "a small number of investors account for a large

27  portion of demand [for Lehman issues], liquidity can disappear quite fast." Another internal

28

1   memorandum recognized that conditions were "clearly not sustainable," that Lehman "saw

2   warning signs" as the firm remained in "illiquid asset [origination] too much/too long," that

3   Lehman "behaved too much [like] investors, not traders" and practiced undisciplined capital

4   allocation.  See Exhibits A and B attached hereto.

5                    **THE ROLE OF ERNST & YOUNG**

6         10.    The fraudulent scheme, described in detail herein, occurred as one of the

7   country's largest accounting firms, E&Y, chose to look the other way and give its stamp of

8   approval to Lehman's financial condition and risk exposure, rather than risk losing lucrative

9   accounting and auditing fees – estimated at $31 million in 2007 alone.  The exceptionally large

10  fees were allegedly earned by E&Y for diligently auditing Lehman's financial statements and the

11  transactions underlying the numbers, providing the public investors – the intended beneficiaries

12  of E&Y's audit reports – with the assurance of a legitimate operation while other competitors

13  were taking substantial writedowns.  Following its audits, E&Y issued unqualified audit reports

14  on the annual financial statements of Lehman, and its internal controls, and continued to review

15  its quarterly financial statements, as well as the press releases regarding the financial status of the

16  Company.  Yet, the auditor violated its most basic professional and contractual duties, as well as

17  generally accepted accounting principles ("GAAP") and generally accepted auditing standards

18  ("GAAS").

19        11.    As Lehman was increasing its leverage position, it expanded its real estate

20  and mortgage portfolio, reaching over thirty times shareholder equity by the end of the first

21  quarter of 2008, the Individual Defendants, with the knowledge and consent of E&Y, falsely

22  assured investors  that its exposure was well contained and that it had hedged against losses.  For

23  example, when two Bear Stearns hedge funds failed in July 2007, Lehman spokesperson Kerrie

24  Cohn stated on July 18, 2007: "The rumors regarding [Lehman's] subprime exposure are totally

25  unfounded."  In truth, as known by E&Y, Lehman had just originated billions in additional risky

26  subprime loans.

27

28

1

**LEHMAN DISCLOSURES**

2      12.     On June 9, 2008, before the markets opened, Lehman announced $700 million in

3  additional losses due to ineffective hedges and a net loss of approximately $5.14 per share for the

4  second quarter of 2008.  Lehman's Chief Executive Officer and Chairman, Defendant Richard

5  Fuld, replaced the Company's President, Defendant Joseph Gregory, and demoted Defendant

6  Erin Callan, who later left.  Fitch, Inc. ("Fitch") and Moody's Investor Services ("Moody's")

7  downgraded Lehman's credit rating, and the price of Lehman's common stock fell, closing down

8  nearly 9% to $29.48.

9      13.     The June 9, 2008 announcement only partially revealed the relevant truth,

10  however, and Lehman raised an additional $6 billion through the offering of common and

11  preferred shares immediately following the announcement.  Lehman's management continued to

12  mislead investors about Lehman's massive exposure.  By September 9, 2008, Lehman executives

13  internally calculated that the Company required at least $3 billion in additional capital.  That

14  same day, JPMorgan's co-CEO, Steve Black, telephoned Defendant Fuld and demanded $5

15  billion from Lehman to cover lending positions.  With regard to the value of Lehman's assets,

16  Wall Street executives who privately reviewed Lehman's real estate portfolio in September 2008

17  figured out immediately that they were overvalued by billions of dollars, with Lehman's $32.6

18  billion in commercial real estate holdings overvalued by 35% or more.  Neither Lehman nor

19  E&Y had ever disclosed this before.

20      14.     On September 10, 2008, less than three months after the $6 billion offerings,

21  Defendants Fuld and Ian Lowitt held a conference call and assured investors that the Company

22  did not need additional capital.  In an earnings pre-release, they reported a $3.9 billion loss for

23  the third quarter of 2008, as well as $7 billion in gross writedowns on its residential and

24  commercial real estate holdings.  In announcing the results during the conference call, Defendant

25  Lowitt, who replaced Callan as Chief Financial Officer, stated that "[t]he majority of our write-

26  downs were in Alt-A driven by increase in Alt-A delinquencies and loss expectations which were

27  specific to Alt-A prices and did not affect the performance of our hedges."  Contrary to

28

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

5

1 Defendants' earlier statements, Lowitt continued: "[U]nfortunately, there is not correct hedge for

2 Alt-A assets . . ." On this news, Lehman's shares declined 7% from the prior day's close to

3 $7.25 per share.

### THE END OF LEHMAN

5   15.   By September 15, 2008, Lehman's share price declined over 94% from the

6 previous day to $0.21 per share. Before the markets opened on September 15, 2008, Lehman

7 filed its petition for bankruptcy – the largest corporate bankruptcy in the history of the United

8 States. Bankruptcy proceedings are underway, and Lehman is in the process of selling assets to

9 satisfy its creditors. The asset sales have been at fractions of book value or previously assumed

10 levels of value. In the aftermath, the Federal Bureau of Investigation ("FBI"), as well as the

11 United States Department of Justice, are investigating Lehman and its senior executives for

12 securities fraud and criminal conduct.

### THE CITY'S LOSSES

14   16.   Public investors, such as the City, have been left in Defendants' ruinous wake.

15 While the Individual Defendants paid themselves millions in compensation, the City suffered

16 substantial losses from its investments in Lehman.

### II.   JURISDICTION AND VENUE

18   17.   Plaintiff, the City of Auburn, was incorporated by the California

19 Legislature in 1866. The City invests its public funds pursuant to the California Government

20 Code. The City's pooled funds are managed by the City's Treasurer and Director of

21 Administrative Services on behalf of the City. The City held and continues to hold the Lehman

22 note in its custodial account in San Francisco, California.

23   18.   Each Defendant has sufficient contacts with California, is a citizen of

24 California, or otherwise purposefully avails himself or herself of benefits from California or has

25 property in California so as to render the exercise of jurisdiction over each by the California

26 courts consistent with traditional notions of fair play and substantial justice. Prior to its

27 bankruptcy, Lehman conducted substantial business in California, including holding investor

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

6

1   seminars and conferences and employee meetings in California.  Lehman maintained several

2   offices in California, including an office at 555 California Street in San Francisco, where its

3   agents offered and sold debt and equity securities to investors.  E&Y also conducted substantial

4   business in California, and presently maintains several offices in California, including an office

5   at 560 Mission Street in San Francisco.

6         19.    The amount in controversy exceeds the jurisdictional minimum of this Court.

7         20.    This action is not preempted by the federal Securities Litigation Uniform

8   Standards Act of 1998 ("SLUSA"), as this action is <u>not</u> a class action and is brought by a single

9   Plaintiff seeking damages.  The claims are brought under California law, including California

10  Corporations Code § 25400 *et seq.*, which prohibits knowing or intentionally false or misleading

11  statements in connection with the sale of a security, and California common law.  The claims are

12  also brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, and § 15 of the Securities

13  Act, 15 U.S.C. § 77o.  California courts have jurisdiction over claims under § 11 and § 15 of the

14  Securities Act pursuant to 15 U.S.C. § 77v(a), and such claims are not subject to removal.

15        21.    Venue is proper in this Court as many of the acts and transactions that constitute

16  violations of law complained of herein, including Lehman's dissemination of untrue statements

17  of material facts about the Lehman securities to the public investors, occurred in San Francisco.

18  Plaintiff held and continues to hold the notes in its custodial account located in San Francisco.

19  **III.    THE PARTIES**

20        **A.    Plaintiff**

21        22.    Plaintiff is the **City of Auburn**.  Auburn is one of California's earliest mining

22  towns, situated in the heart of the Gold Country.  Auburn was first incorporated by the California

23  State Legislature in 1860 and again in 1888.  The City invests its public funds pursuant to the

24  California Government Code.  The City's investments are managed by the Auburn City Treasurer

25  and Director of Administrative Services on behalf of the City.

26

27

28

23.    In reliance on Defendants' misrepresentations and omissions, the City purchased and held the Lehman note, as described below, in California.  As a result, the City has suffered substantial losses.

**B.    Defendants**

**1.    Officer Defendants**

24.    Defendant **Richard S. Fuld, Jr.,** ("Fuld") joined Lehman in 1969.  He has served as Chairman of the Board of Directors of Lehman and Lehman Brothers Inc. ("LBI") since April 1994 and Chief Executive Officer ("CEO") of Lehman and LBI since November 1993.

25.    Defendant **Christopher M. O'Meara** ("O'Meara") served as Lehman's Chief Financial Officer ("CFO"), Controller, and Executive Vice President from 2004 until December 1, 2007.  O'Meara joined Lehman in 1994, and prior to serving as CFO, operated as Lehman's Global Controller.  As Controller, O'Meara supervised Lehman's internal accounting programs and procedures.  In his role as the head of Risk Management, O'Meara was also responsible for supervising Lehman's risk mitigation strategies and procedures.  Beginning on December 1, 2007, O'Meara served as the head of Worldwide Risk Management.

26.    Defendant **Joseph M. Gregory** ("Gregory") joined Lehman in 1974 as a commercial paper trader.  Gregory ultimately served as Lehman's President and Chief Operating Officer ("COO") from May 2004 until he resigned in June 2008.  Gregory, in his role as COO, oversaw the day-to-day management of Lehman's operations.  From April 2000 until May 2002, Gregory was Lehman's Chief Administrative Officer, and from 1996 to April 2000, Gregory was head of Lehman's Global Equities Division, in charge of the overall equities business.  From 1991 to 1996, Gregory served as co-head of Lehman's Fixed Income Division.  From 1980 to 1991, Gregory held various management positions in the Fixed Income Division, including head of Lehman's mortgage business.

27.    Defendant **Erin Callan** ("Callan") joined Lehman in 1995 and served as Lehman's CFO and Global Controller from December 2007 until she resigned in June 2008.  Callan served in various capacities at the Company, including head of the Investment Banking

1    Global Hedge Fund Coverage Group, the Global Finance Solutions Group and Global Finance

2    Analytics Group.

3            28.    Defendant **Ian Lowitt** ("Lowitt") joined Lehman in 1994.  He ultimately replaced

4    Callan as CFO in June 2008 and also served as the Co-Chief Administrator Officer, overseeing

5    Lehman's finance organization, including Financial Control, Investor Relations, Planning and

6    Analysis, Product Control, Tax, and Treasury.  In his role as Co-Chief Administrative Officer,

7    he was responsible for the global oversight of Risk Management.  Lowitt served as Treasurer and

8    Global Head of Tax from 2000 until 2005.

9            29.    Defendant **David Goldfarb** joined Lehman in 1993, after 14 years in Ernst &

10   Young's Financial Services practice, where he was a partner.  He became the firm's Global

11   Controller in 1995.  In 1998, he was named Chief Financial Officer of LBI and in April 2000, he

12   was promoted to Chief Financial Officer of Lehman.  He served in that capacity until 2004, and

13   regularly participated in making statements to the public market about Lehman.  For example, in

14   September 2004, Goldfarb spoke at the Annual Investment Conference at the Ritz-Carlton Hotel

15   in San Francisco and discussed Lehman's performance and future outlook.  In 2004, Goldfarb

16   was promoted to Chief Administrative Officer, responsible for Finance, Risk Management and

17   Investor Relations and, in addition, oversaw Strategy, Technology and Operations, Corporate

18   Communications and Corporate Real Estate.  Defendant O'Meara, the then CFO, reported to

19   Goldfarb.  In 2006, Goldfarb served as the global head of Strategic Partnerships, Principal

20   Investing and Risk.  In June 2008, Goldfarb assumed the position of Chief Strategy Officer.

21           30.    Defendants Fuld, O'Meara, Gregory, Callan, Lowitt and Goldfarb are collectively

22   referred to herein as the "Officer Defendants."  All of the Officer Defendants served on

23   Lehman's Executive Committee, chaired by Defendant Fuld.  The Executive Committee was

24   responsible for assessing Lehman's risk exposure and related disclosures.  The Executive

25   Committee reportedly met twice a week for two hours at a time and devoted a significant amount

26   of that time to discussions about managing risk.  Thus, the Executive Committee was intimately

27   familiar with the risk that Lehman took on in all the different areas of its business.

28

### 2.   Finance and Risk Committee Defendants

31.    Defendant **John F. Akers** ("Akers") at all relevant times a director of Lehman. Akers joined Lehman's Board in 1996, and served as the Chairman of the Compensation and Benefits Committee and a member of the Finance and Risk Committee.

32.    Defendant **Roger S. Berlind** ("Berlind") was at all relevant times a director of Lehman. Berlind was also a director of LBI. Berlind joined Lehman's Board in 1985, and also served as a member of the Audit Committee and the Finance and Risk Committee.

33.    Director **Marsha Johnson Evans** ("Evans") was at all relevant times a director of Lehman. Evans joined Lehman's Board in 2004. She served as Chairperson of the Nominating and Corporate Governance Committee, a member of the Compensation and Benefits Committee, and a member of the Finance and Risk Committee.

34.    Defendant **Roland A. Hernandez** ("Hernandez") was at all relevant times a director of Lehman. Hernandez joined Lehman's Board in 2005. He served on the Finance and Risk Committee. Hernandez is a resident of California.

35.    Defendant **Henry Kaufman** ("Kaufman") was at all relevant times a director of Lehman. Kaufman joined Lehman's Board in 1995. For 26 years, Kaufman was with Salomon Brothers Inc., where he was a Managing Director, Member of the Executive Committee, and in charge of Salomon's four research departments. Kaufman served as the Chairman of the Finance and Risk Committee.

36.    Defendants Akers, Berlind, Evans, Hernandez and Kaufman are collectively referred to herein as the "Risk Committee Defendants." The Officer Defendants and the Risk Committee Defendants are collectively referred to herein as the "Individual Defendants" or "Defendants." All of the Risk Committee Defendants sat on the Finance and Risk Committee, which was charged with the responsibility to review and advise the Board of Directors on the financial policies and practices of the company, and particularly risk management. The Committee also was supposed to review major capital expenditure programs and significant

1   capital transactions and the respective risks that they entailed.  The Committee reportedly met

2   only twice in 2007 and early 2008, as Lehman's risk exposure grew exponentially.

3          37.     The Individual Defendants, because of their senior positions at Lehman, were

4   controlling persons of the Company and possessed the power and authority to control the

5   contents of Lehman's reports to the SEC, press releases, and presentations to securities analysts,

6   money and portfolio managers, institutional investors, and individual investors such as the City –

7   i.e., the market.

8          **C.     Auditor Defendant**

9          38.     Defendant **Ernst & Young LLP** ("E&Y") is a public accounting firm with

10  offices throughout the world, including in San Francisco, California.  E&Y served as Lehman's

11  outside auditor for years and at all times relevant hereto.  Lehman engaged E&Y to audit its

12  financial statements, as well as to provide a written report as to whether the internal controls

13  were effective and whether the financial statements  were fairly presented.  Lehman also engaged

14  E&Y to perform reviews of its quarterly financial results.  For its work, E&Y earned tens of

15  millions of dollars in annual fees, including over $31 million in 2007 alone.

16         **D.     Doe Defendants**

17         39.     Except as described herein, Plaintiff is ignorant of the true names of Defendants

18  sued as Does 1 through 20 inclusive and, therefore, sues these Defendants by such fictitious

19  names.  Plaintiff will seek leave of the Court to amend this Complaint to allege their true names

20  and capacities when they are ascertained.

21         40.     Plaintiff alleges that each of these Doe Defendants is responsible in some manner

22  for the acts and occurrences alleged herein, and that Plaintiff's damages were caused by such Doe

23  Defendants.

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    E.    <u>Agents and Co-Actors</u>

2    41.    At all relevant times, each Defendant was and is the agent of each of the

3    remaining Defendants, and in doing the acts alleged herein, was acting within the course and

4    scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the

5    Defendants.

6    42.    Defendants, and each of them, are individually sued as participants and as aiders

7    and abettors in the improper acts, plans, schemes, and transactions, to induce Plaintiff to

8    purchase and hold the securities that are the subject of this Complaint.

9    43.    Defendants, and each of them, have participated as members of the fraud or acted

10    with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this

11    Complaint, and have performed acts and made statements in furtherance of the violations and

12    conspiracy.

13    F.    <u>Unnamed Participants</u>

14    44.    Numerous individuals and entities participated actively during the course of and

15    in furtherance of the conspiracy and concealed such information from the public.  There was a

16    conspiracy and many acts were done in the course of and in furtherance of the conspiracy by

17    statements, conduct, and intent to defraud.  The individuals and entities acted in concert by joint

18    ventures and by acting as agents for principals, in order to advance the objectives of the

19    conspiracy.  The acts were intended to promote the conspiratorial objectives.

20    IV.    <u>FACTUAL ALLEGATIONS</u>

21    A.    <u>The City And Its Investments</u>

22    1.    <u>State Law Authority And Requirements</u>

23    45.    California Government Code Section 53630.1 states, "The Legislature hereby

24    finds that the solvency and creditworthiness of each individual local agency can impact the

25    solvency and creditworthiness of the state and other local agencies within the state and all of its

26    political subdivisions, the Legislature hereby declares that the deposit and investment of public

27    funds by local officials and local agencies is an issue of state wide concern."  Based on this

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1    policy, California Legislature enacted several statutes governing the investment of a city or

2    county's surplus public funds, including the types and amounts of such investments. Cal. Govt.

3    Code § 53600 et seq.

4        46.    Pursuant to state law, the primary objectives in managing public funds, in order of

5    priority, are to 1) safeguard the principal of the funds; 2) satisfy the liquidity needs of depositors;

6    and 3) achieve a return on the funds. Cal. Govt. Code §§ 27000.5, 53600.6. Consistent with

7    these objectives, state law places strict limitations on the instruments in which local agencies

8    may invest, as well as the concentration of such investments. For example, treasury investments

9    are limited, by statute, to conservative instruments such as U.S. Treasury obligations, highly-

10   rated commercial paper, certificates of deposit, and the like.

11       47.    State law also places restrictions upon a city's concentration of investments.

12   Such restrictions depend on the instruments at issue, as well as the type of local entity making the

13   purchase. For example, Government Code Section 53601, which applies specifically to local

14   agencies, authorizes a city to invest up to 10% of fund proceeds into the commercial paper of a

15   single issuer so long as the issuer has a rating of A-1/P-1/F-1. Section 53601 also allows up to

16   30% of a city's funds to be invested in "medium term notes," but only 20% of a city's funds to be

17   invested in money market mutual funds.

18       2.    **The Structure And Investment Policy Of The City**

19       48.    The City has invested its public funds for many years. The funds are used

20   to maintain sufficient liquidity of cash flow needs and attain maximum yield possible. Funds

21   supplement projects ranging from Special Revenue Funds to Capital Projects Funds.

22       49.    The City's investments are governed by the City's Investment Policy, which was

23   developed and adopted pursuant to Government Code Section 53600 et seq. The purpose of the

24   investment policy is to establish overall guidelines for the management and investment of the

25   City's public funds. The Policy sets forth controls relating to investment authority, the prudent

26   investor standard, reporting, auditing, accounting methods, withdrawal request and other related

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    control matters.  Finally, the Investment Policy sets forth the procedures to be followed in

2    executing investment transactions.

3        50.    The Director of Administrative Services prepares the Policy which is reviewed

4    by the Investment Review Committee and ultimately approved by the City Council.

5        51.    Pursuant to the City's Investment Policy, the responsibility for making

6    investments resides with the Treasurer and Director of Administrative Services.  The Director of

7    Administrative Services and City Treasurer submit a quarterly investment report to the City

8    Council and City Manager.  The Director of Administrative Services is responsible for

9    establishing and maintaining an internal control structure designed to ensure that the City's assets

10   are protected from loss, theft, or misuse.

11       52.    The investment objectives of the City' Investment Policy are consistent with state

12   law and can be summarized, in order of priority, as: (1) safety, (2) liquidity and (3) yield.

13       53.    As a result of these statutory mandates, the City has a long history of

14   maintaining high quality investment portfolios governed by a disciplined investment strategy of

15   diversification and conservatively designed to achieve a reasonable balance of risk and a stable

16   source of earnings.

17       54.    Unfortunately, in reliance on Defendants' misrepresentations and omissions,

18   described in more detail below, the City purchased an approximately 125,000 unit interest in a

19   Lehman note, Cusip No. 52517PSC6, which is now worthless.  The note was purchased on

20   March 31, 2008, with a maturity date on January 18, 2012.

21       B.     **The Development of The Mortgage Securitization Industry**

22              1.     **Increasing Use of Sub-Prime Loans**

23       55.    Between 1995 and 2005, there was a dramatic rise in home ownership in the

24   United States.

25       56.    One of the most important factors for the increase in home ownership was

26   innovation in the mortgage finance industry, as more and more individuals sought home loans.

27   However, unbeknownst to investors, loan originators such as Lehman began to compete for

28

potential borrowers by lowering underwriting standards and offering new loan products geared

towards borrowers with weaker credit.

57.    For example, loan originators reduced minimum qualifying credit scores, allowed

borrowers to finance a greater percentage of the property value or carry a higher debt load such as

"no money down loans". Many of these riskier mortgages are generally referred to as "subprime

loans." "Subprime" describes borrowers who do not qualify for prime interest rates because they

have weaker credit histories typically characterized by payment delinquencies, previous charge-

offs, judgments, or bankruptcies, low credit scores, high debt-burden ratios, or high loan-to-value

ratios.

58.    The subprime mortgage market grew from $40 billion in 1994 to $600 billion in

2005, amounting to approximately 20% of the total residential loans originated in 2005. There

was a dramatic growth in "Alt-A" loans, where there is reduced or no documentation required to

secure a mortgage. According to a report by Standard & Poor's ("S&P"), Alt-A originations

increased from less than $20 billion in 2000 to more than $300 billion in 2005.

59.    Subprime and Alt-A mortgage originators offered products with greater risk of

nonpayment, such as interest-only mortgages that allowed borrowers to pay only interest for a

period of time, negative amortization loans, which allowed borrowers to make a minimum

payment that was less than the monthly accrued interest on the mortgage, thus increasing the

principal amount owed on that loan, and initial fixed-rate mortgages (often at relatively low

"teaser" rates) that later converted to adjustable market rates, otherwise known as adjustable rate

mortgages or "ARMs."

60.    The growth of the commercial mortgage market followed a course similar to the

residential market. A robust secondary market grew for commercial mortgages, and lending

standards for commercial loans declined. For example, in April 2007, Moody's described its

concern over the "continued slide" in commercial lending standards. Moody's observed that,

like residential lenders, commercial lenders were requiring less documentation. Further,

commercial mortgages originated in the first quarter of 2007 exceeded the estimated value of the

1 │ underlying properties by 11%. Moody's also noted that the vast majority of mortgages allowed

2 │ for interest-only payments and many included secondary financing. Moody's also highlighted

3 │ that property values had reached "unprecedented highs."

4 │        **2.**     <u>The Practice Of Pooling Risky Mortgages As A Security</u>

5 │        61.     Typically, to protect itself from risk that a borrower would default on the loan, the

6 │ originator held a lien on the property as collateral for the loan. By 1990, however, a new model

7 │ emerged, as secondary market participants began purchasing mortgages from the loan originators

8 │ soon after the mortgages were issued.

9 │        62.     Wall Street firms were among the largest purchasers of mortgages on the

10 │ secondary market. In a process known as securitization, the firms pooled mortgages into

11 │ Mortgage Backed Securities ("MBS"), including both Residential Mortgage Backed Securities

12 │ ("RMBS") and Commercial Mortgage Backed Securities ("CMBS"), and sold interests in the

13 │ underlying cash flow from the mortgages to investors, who received a right to future payments as

14 │ borrowers made principal and interest payments. Wall Street firms collected large fees for

15 │ structuring, underwriting, and servicing the MBSs. These large fees fueled the demand for loans

16 │ to securitize, which led to even more competition among lenders for borrowers and, to increase

17 │ the pool of borrowers, contributed to a marked decline in lending standards. On the plus side, the

18 │ securities offered rich and institutional investors a steady rate of return. That was true, of course,

19 │ only if the mortgages were solid.

20 │        63.     The securities were dependent on interest rates. For example, rising interest rates

21 │ negatively affect borrowers whose underlying loans are ARMs, meaning that the interest rate

22 │ paid by the borrower changes along with the prevailing market interest rates. For example, if an

23 │ RMBS is backed by a pool of non-prime ARMs, a rise in interest rates increases the borrowers'

24 │ monthly payments, increasing the likelihood that some borrowers will default on their mortgages,

25 │ thereby decreasing the value of the security. Rising interest rates also have a negative effect on

26 │ borrowers in fixed-rate mortgages. While housing prices were rising, many people borrowed

27 │ more than they could afford, believing that they could take advantage of the price appreciation

28 │

1    and refinance into mortgages with better terms once their equity interest increased.  Increasing

2    interest rates make such re-financing less attractive.

3        64.    A slowdown in housing price appreciation or a decline in housing prices also

4    lowers the value of RMBSs. Counting on housing price appreciation, many borrowers believed

5    that they could simply refinance into better terms or sell the property for a profit.  Instead, when

6    prices failed to rise, these borrowers became encumbered with mortgages they could not afford.

7    Similar problems extended to commercial mortgages, as lenders provided mortgages for close to

8    the entire value of a property.  Further, commercial lenders originated mortgages with monthly

9    payments greater than the projected monthly income on the properties.

10       65.    Declining prices also created incentives for certain borrowers to abandon their

11   mortgages.  If prices decline such that the value of a home is less than the outstanding amount on

12   the mortgage (especially likely in those situations where lenders provided mortgages for amounts

13   close to the total value of the home), a borrower who cannot afford the mortgage payments has

14   an incentive to simply walk away from the "upside down" mortgage.

15       66.    Lehman served as the key player in linking non-prime mortgage originators

16   with the ultimate MBS investors.  To obtain a ready supply of loans to pool and securitize,

17   Lehman entered into purchase agreements and extended warehouse lines of credit to loan

18   originators.  In the purchase agreements, investment banks agreed to purchase a certain amount

19   of mortgages from a loan originator.  Through warehouse lines of credit, investment banks

20   extended credit to loan originators to fund a cycle of mortgage lending.  In return for the line of

21   credit, the originator typically agreed to grant the investment bank the right to either buy the

22   mortgages or sell securities on a certain portion of the mortgages pool.

23       C.    **Lehman's Emerges As The Industry Leader In Mortgage-Backed Securities**

24       67.    Beginning in the late 1990s, and increasing dramatically just prior to 2004,

25   Lehman participated directly in all aspects of the residential and commercial mortgage markets,

26   and its mortgage-related businesses comprised the Company's single largest revenue component.

27   This participation included originating mortgages, purchasing mortgages, packaging mortgages

28

1  into securities, and marketing the securities to investors.  The Company promoted itself as "a

2  market leader in securitization transactions, including securitizations on residential and

3  commercial loans and "the origination, structuring and underwriting of asset-backed securities."

4  Lehman also claimed that its vertically-integrated mortgage business minimized risks associated

5  with holding mortgage-related assets on its balance sheet, which differentiated itself from others

6  who were not vertically integrated and which held non-prime loans on their balance sheet along

7  with the risk exposure until they accumulated a large enough loan pool to securitize.

8       68.     As Defendant Callan explained during one investor conference, Lehman "didn't

9  look at participating in the residential mortgage market as taking a directional bet one way or the

10  other."  Instead, Lehman sought only to hold mortgage assets on its books long enough so that

11  they could be securitized and sold to investors.  As Callan described: "[w]e looked at it as a

12  business where we could take a spread out of this originating to distribute.  If you have that mind

13  set, your inclination then is to hedge whatever inventory you get long, until the time frame to

14  which you can distribute the inventory through a securitization or otherwise.  That was our

15  model."  Defendant Callan explained:

16       It doesn't come from Goldman's model of taking a proprietary bet, or Morgan
         Stanley's model, or even Merrill's model of warehousing a significant amount of
17       product.  It just comes from a basic focus and philosophy that we really didn't
         want to go long the product or short the product.  We wanted to originate to
18       distribute and we hedged that origination capability.

19       69.     However, the mortgages on Lehman's balance sheet exposed Lehman, the assets

20  of which were highly leveraged, to massive losses when the mortgage market and the market for

21  mortgage-backed assets declined.

22       70.     Lehman's business model included forming subsidiaries to provide whole loans

23  or "raw product" to the firm's securitizations.  According to its 2007 Form 10-K, Lehman

24  originated approximately $60 billion in residential mortgages during 2006 and $47 billion during

25  2007.  Twenty-five percent of the loans Lehman originated through its subsidiaries were

26  subprime loans.

27

28

71.    In the late 1990s, Lehman was underwriting loans issued by questionable lenders. The Company did a lot of the underwriting early on for loans issued by notorious lenders and loan servicers, including Delta Funding Corp., First Alliance Mortgage Company ("FAMCO"), and Aurora Loan Services LLC ("Aurora").

72.    The U.S. Justice Department sued Delta Funding in 2000 under the Fair Housing Act for a range of illegal behavior, which included charging unfairly large fees and penalties to homeowners, handing out kickbacks, and charging more to African-American homeowners.

73.    In 2000, FAMCO filed for bankruptcy protection in the Central District of California. In August 2001, a class action was filed against FAMCO and Lehman, alleging that Lehman helped FAMCO cheat borrowers. In 2003, a federal jury ruled that Lehman not only knew about the fraud, but actually assisted the company in deceiving homebuyers and awarded damages against FAMCO and Lehman of $51 million. According to Lehman's recent SEC filings, the suit was settled out of court for an undisclosed sum earlier this year.

74.    Lehman purchased an entity now known as Aurora Loan Services LLC ("Aurora"), a residential loan originator and servicer of predominately "Alt-A mortgage products," and moved its headquarters from Nebraska to Colorado.

75.    In its Form10-Q filed on July 15, 2003, Lehman reported that the acquisition of Aurora "adds long-term value to our mortgage franchise by allowing further integration of the business platform. The mortgage loans originated by [Aurora] are expected to provide a source of loan product for our securitization pipeline."

76.    In fact, all of Aurora's production went to Lehman, with Aurora acquiring loans in the name of its subsidiary. Aurora rapidly expanded and eventually held an $80 billion mortgage portfolio, making it one of the largest loan-servicing companies in the country. Aurora was also one of the largest loan originators, meaning that some portion of the bad loans, which led to Lehman's downfall, were issued by its own subsidiary. After Lehman obtained loans through Aurora, Lehman handled all secondary transactions and handled all pricing out of New York. Lehman dictated what loans Aurora was buying and had to approve Aurora's guidelines. Aurora purchased pools of closed loans on behalf of Lehman for securitization deals. Aurora

1  bought mortgages from about 10,000 brokers and originators around the country.  Lehman also

2  purchased pools of loans from subprime originators such as Countrywide, New Century,

3  American Home Mortgage and  Washington Mutual.

4       77.  Lehman also purchased BNC Mortgage LLC ("BNC") in 2000, which gave

5  Lehman a subsidiary that directly lent to homebuyers.  Lehman described BNC as its "subprime

6  origination platform."  BNC focused on subprime originations until it closed in August 2007.

7  BNC sold roughly 75% of its production to Lehman, and as 2007 progressed and the market for

8  non-prime loans deteriorated, Lehman purchased an even higher percentage of BNC's loans.

9       78.  As with the residential mortgage market, Lehman became increasingly involved

10  all aspects of the commercial mortgage market – origination of commercial mortgages,

11  securitization of mortgages, and marketing of securities backed by commercial mortgages.  It

12  originated approximately $27 billion in commercial mortgages in 2005 and $34 billion in 2006.

13  In 2007, Lehman increased its origination activity even as the real estate markets deteriorated,

14  originating $60 billion in commercial mortgages.  Lehman's commercial side originated all of its

15  own loans and did not purchase them from other companies.

16       79.  As of March 2008, Lehman had more commercial holdings than any other firm.

17  It had over $10 billion more than its nearest competitor, Citigroup, and more than double the

18  commercial holdings of Morgan Stanley, Bear Stears, and JPMorgan.

19       80.  Including both residential and commercial mortgages, at the Individual

20  Defendants' direction, Lehman vastly increased its exposure to losses in the mortgage market.

21  At the very time the mortgage and housing markets were melting down in 2006  and 2007, and

22  mortgage assets were becoming increasingly illiquid.   The aggregate value of this portfolio grew

23  by 54% in 2007, from $57.7 billion at year-end 2006 to over $89.1 billion by year-end 2007.

24      D.  **As the Mortgage Market Deteriorates, Lehman's Risk Exposure Multiplies**

25       81.  As Lehman's mortgage and mortgage-related assets comprised a greater

26  percentage of Lehman's shareholders equity, the Company faced an increased risk that a smaller

27  percentage decline in the value of these assets would erode its shareholder equity and render the

28  Company insolvent.  For example, because Lehman's mortgage and mortgage-related assets were

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    roughly four times its shareholders equity in the second quarter of 2007, if Lehman wrote down

2    the value of these assets by just 25% during the quarter, the loss would have been equal to its

3    total shareholder equity.

4           82.    By early 2006, the U.S. entered a period marked by a steep decline in home price

5    appreciation and rising mortgage interest rates, which, combined, led to an unparalleled number

6    of mortgage delinquencies and home foreclosures.  The crisis spread to the commercial real

7    estate market.  The collapsing real estate markets materially affected the market value of the

8    billions of dollars of mortgages and MBSs on Lehman's balance sheet.

9           83.    Home price indices noted that home prices had peaked in mid-2004 and then

10   demonstrated a dramatic drop in annual returns.  As U.S. housing prices fell, interest rates

11   increased sharply after 2005, which was particularly damaging for borrowers who had purchased

12   homes with ARMs.  As long as housing prices continued to increase, borrowers could refinance

13   their loans or sell their homes for big gains.  As prices dropped, however, many borrowers who

14   had ARMs found it impossible to afford the increasing payment when rates adjusted upward in

15   2006 and 2007, and were unable to refinance the loans because the outstanding mortgage debt

16   exceeded the value of the home, leading to an unprecedented number of mortgage defaults and

17   home foreclosures.

18          84.    Similarly, foreclosure databases reported dramatic increases in foreclosure filings.

19   The rapid increase in mortgage defaults and home foreclosures between 2005 and 2007, at

20   precisely the time when Lehman had expanded its mortgage-related business and had amassed a

21   portfolio of nearly $90 billion in mortgage-backed assets, including significant exposure to assets

22   backed by Alt-A and subprime loans, compromised the value and diminished the marketability of

23   these assets on Lehman's balance sheet.

24          85.    Defendants, including E&Y, were well aware of these market conditions

25   generally, and Lehman's growing exposure, specifically.  In a November 10, 2008 article,

26   Bloomberg reported that in November 2004, more than two years before the bull market reached

27   its peak, Defendant Fuld – known as the "Gorilla" at Lehman – told people around him that low

28   interest rates and cheap credit would create a bubble that could one day pop: "It's paving the road

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

21

1    with cheap tar. When the weather changes, the potholes that were there will be deeper and

2    uglier." Later, in January 2006, several banks, including Lehman, collaborated with Markit

3    Group Limited to create the ABX indices ("ABX") to track the performance of various RMBS

4    tranches. Markit Group Limited also created CMBS indices ("CMBX"), which provide

5    value and pricing information on the CMBS market.

6         86.    However, during the first half of 2007, the ABX plummeted, indicating that the

7    cost of insuring subprime RMBSs had increased dramatically. The ABX indicated that the value

8    of RMBSs backed by subprime mortgages was deteriorating at a near-historic pace throughout

9    2007. In addition, in the first half of 2007, given the rise in delinquencies and defaults, the rating

10   agencies – such as Fitch, S&P, and Moody's – downgraded MBSs, reflecting the reduced value

11   of the tranches. For example, in the first quarter of 2007, Moody's stated that "loans securitized

12   in the first, second and third quarters of 2006 have experienced increasingly higher rates of early

13   default than loans securitized in previous quarters." Moreover, in June, Moody's noted that,

14   "within the 2006 vintage . . . the performance of late-2006 pools is generally worse than that of

15   early-2006 pools." Further, "following the pattern of serious delinquencies . . . cumulative losses

16   for late 2006 pools have trended higher than those for early 2006 pool at the same points of

17   seasoning."

18        87.    Following the deterioration in RMBSs, CMBSs also began to decline in value in

19   2007. As early as April 2007, Moody's indicated that it would require more protection for

20   investors in CMBSs because of a "continued slide" in lending standards. Similar to residential

21   mortgages, commercial mortgage delinquencies steadily increased throughout 2007. According

22   to the Federal Reserve Board, the overall delinquency rate was 1.1% in the second quarter of

23   2007, but rose to 1.94% in the fourth quarter, the highest level since 2001.

24        88.    Beginning in mid-2007, indices tracking CMBS tranches indicated an increasing

25   risk of default in all the tranches. As noted above, in contrast to the ABX, an increase in the

26   CMBX indicates that the market expects rising defaults. CMBX spreads widened beginning in

27   mid-2007, even for the highest rated tranches, indicating that the market expected large increases

28   in defaults and losses on CMBSs.

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

89.    On May 3, 2007, UBS announced that it was closing an in-house hedge fund after suffering huge losses investing in the U.S. mortgage securities industry.  The fund, Dillon Read Capital Management, had been in existence for less than two years.  A short time later, Bear Stearns contacted investors in two of its hedge funds that invested in subprime debt instruments, informing them that "preliminary estimates show there is effectively no value left for the investors in the Enhanced Leverage fund and very little value left for the investors in the High-Grade Fund."  Bear Stearns warned that bonds that had high credit ratings were experiencing "unprecedented declines" in value.

90.    In response, analysts speculated that Bear Stearns announcement should trigger mass revaluation of portfolios with similar subprime debt instruments held by Wall Street banks, such as Lehman, which had even greater exposure to subprime mortgages.  On July 18, 2007, in response to the rumors, Lehman spokesperson Kerrie Cohan reportedly stated: "[t]he rumors regarding [Lehman's] subprime exposure are totally unfounded."

91.    Even after Bear Stearns provided a $3.2 billion infusion for one of the hedge funds, both funds filed for bankruptcy protection.  On Tuesday, August 14, 2007, Lehman's shares fell sharply on news that the two hedge funds were collapsing.  According to the *Dow Jones News Service*:

> Lehman and Bear Stearns tend to be twinned in investors' minds, because they are smaller and less diversified than Wall Street giants Goldman Sachs Group (GS), Merrill Lynch & Co. (MER) and Morgan Stanley (MS). Yet Lehman is seen as taking more risk than Bear Stearns. And in the current environment, Lehman may be paying a price for its relative silence about its exposure to trouble mortgages and high-risk debt.

92.    Defendants were well aware of Data on the performance of MBSs issued and sold by Lehman from 2005 to 2007, and knew that loans in Lehman's securitization pools experienced increased deficiencies and defaults.  Lehman collected, aggregated, and tracked the performance of its mortgage pools in order to comply with SEC regulations.

93.    The data illustrated that loans originated in 2005, 2006 and 2007 experienced markedly higher rates of delinquency and foreclosure than comparable loans originated in prior years.  The performance of loans in Lehman's securitizations also deteriorated, as Lehman

1   was forced to "replace" loans in some securities.  Indeed, between March and April of 2006,

2   Lehman put funds back into two securitization entities, SASCO and LXS, because mortgages in

3   these entities were not performing.

4          94.    In late 2006, many of the loans Aurora acquired went into default immediately

5   upon acquisition.  Given the early defaults, Lehman was faced with a large amount of repurchase

6   requirements from its securitizations.  Aurora was also having trouble getting originators to

7   repurchase loans on 2006.  The defaulted loans sat on the books.  Lehman's subprime originator,

8   BNC, was also facing dramatically increasing numbers of repurchase requests from loan

9   purchasers who claimed that certain loans violated BNC's representations and warranties.  The

10  repurchase requests increased dramatically and more employees began working on repurchase

11  requests.  BNC held weekly meetings to review repurchase requests.

12         95.    As a result of unfulfilled requests, Lehman sued counterparties for failing to

13  repurchase loans.  As early as June 22, 2006, Lehman sued Master Financial, Inc. ("MFI"), a loan

14  originator based in California, for failing to repurchase loans that it had sold Lehman.  According

15  to the Company's complaint, Lehman "is informed and believes and based thereon alleges that

16  MFI failed to follow the contractually required 'legal, proper, prudent and customary practices'"

17  in originating the loans at issue.  Lehman further claimed that "the misrepresentations and other

18  irregularities, including payment defaults [on the loans] . . . lowered their value considerably as

19  investment loans.  Because MFI failed and refused to repurchase the irregular, non-conforming

20  and poorly-performing loans when demand was made, [Lehman] was the obligated to liquidate

21  them by foreclosure or resale at considerable discount due to their reduced value, resulting in

22  significant losses."  Lehman sued other lenders during this time period.  For example, in August

23  2007, Lehman sued Fieldstone Mortgage Company for failing to repurchase delinquent loans.

24         96.    The repurchase requests demonstrate the rapidly deteriorating value of Lehman's

25  mortgage and mortgage-related assets held on its balance sheet.  Moreover, Lehman's and it

26  subsidiaries' inability to successfully pursue repurchase requests resulted in a dramatic increase

27  on Lehman's exposure to high risk, and in some cases, non-performing, mortgage assets during

28  this time period.

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

24

97.     Despite the rise in repurchase requests and the inability of Lehman's subsidiaries to collect on their repurchase requests, Aurora did not cease doing business with many of its correspondent lenders, as it needed to fulfill Lehman's securitization needs.  Aurora continued to buy low quality loans despite the increasing problems in the industry.  Aurora continued to buy loans from certain lenders even though they had large numbers of outstanding unpaid repurchase claims.  Aurora's "loss management" unit dealt with the various counterparties with respect to repurchases.  Repurchase requests increased in 2007 with hundreds of millions of dollars worth of non-performing loans remaining with Aurora.

98.     Given the rapidly declining performance of non-prime mortgages, in early 2007, Lehman began making margin calls on originators due to the decreased value of underlying mortgage assets used in connection with such credit lines.  For example, in March 2007, Lehman made the first in a series of margin calls on its warehouse line of credit to Alt-A mortgage lender American Home Mortgage ("AHM"), claiming that the value of AHM's notes had dropped significantly.  Following three months of mortgage calls by Lehman, and after Lehman had declared AHM in default of its payment obligations, AHM declared bankruptcy in August 2007.

99.     Further, Lehman issued numerous margin calls to Accredited, another mortgage lender on the Company's credit facilities, in early 2007.  Again, these margin calls resulted from a decline in the value of the collateral used to secure those facilities – the lender's mortgages.

100.    On July 5, 2007, Lehman cut off a $1.5 billion credit line to Option One Mortgage Corporation, a subsidiary of H&R Block, Inc.

101.    In the Spring 2007, Lehman held a major conference for employees in Phoenix, Arizona and reported that the market's appetite for subprime loans had changed, and, as result, Lehman needed to tighten up guidelines.

102.    Given the increasing problems in the mortgage market in 2006 and 2007, origination and securitization businesses declined substantially.  Lehman experienced the decline directly, with both its origination and securitization business slowing severely.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

25

103.    As the securitization market slowed, Lehman was forced to account for many of the securitization deals as secured financings instead of sales.  Securitizers, such as Lehman, prefer to account for deals as sales rather than secured financings, since secured financings do not allow for the removal of securitized assets from the balance sheet.  For financial institutions, the removal of non-performing assets from the balance sheet is one of the primary benefits of engaging in the sale of securitized assets.

104.    Lehman stated in its SEC filings that it "is a market leader in securitized transactions, including securitizations of residential and commercial loans." Further, Lehman indicated that the vast majority of its securitization transactions were designed to be booked as sales, not as secured financings, which would have to remain on Lehman's balance sheet. However, Lehman was having trouble qualifying its securitizations as sales.  Even with prime deals, Lehman was having trouble selling the lower-rated tranches.   If Lehman could not sell the required percentage of a securitization deal, then it would remain on Lehman's balance sheet. Securitizations slowed by the Summer 2007.

105.    Additionally, the delinquent and defaulting mortgages assets that accumulated in Lehman's holdings had a negative impact on its liquidity and capital resources.  Lehman faced significant liquidity problems due in large part to the decline in value of mortgage-related assets. Lehman purchased many of its assets using secured credit obtained under tri-party repurchase agreements.  If the market value of pledged assets declined, secured lenders would impose "haircuts" on Lehman.  The reduced availability of secured financing forced Lehman to draw down on its liquidity pool in order to execute transactions.

106.    In August 2007, Lehman announced that it was shutting down BNC.  According to a Lehman press release announcing the closure, "market conditions have necessitated a substantial reduction in... resources and capacity in the subprime space."

107.    Similarly, by January 2008, Lehman closed Aurora's wholesale and correspondent lending divisions. According to Lehman's January 17, 2008, press release: