1    Lehman Brothers announced today that it will substantially reduce its resources and
     capacity in the U.S. residential mortgage origination space in light of the dislocation in
2    the mortgage markets. As a result, the Firm is suspending its Wholesale and
     Correspondent lending activities at its Aurora Loan Services subsidiary. Aurora will
3    continue to originate loans through its direct lending channel, and will maintain its
     servicing business.
4

5    E.    **Lehman's SEC Filings And Related Market Reports, Reviewed And Audited**
           **by E&Y, Failed To Disclose Lehman's Increasing Exposure To Mortgage-**
6          **Related Losses**

7        108.    As Defendants were receiving internal reports detailing the deterioration of

8    Lehman's real estate portfolio, Lehman's SEC filings, related market reports, and E&Y's audit

9    reports during this period continued to downplay any increased risk exposure from Lehman's

10   nearly $80 billion in mortgage-related holdings.  To the contrary, Defendants repeatedly

11   reaffirmed that Lehman's financial statements properly reflected the Company's financial

12   condition and that its internal control structure was sound and reliable.

13       109.    Pursuant to Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 ("SOX"),

14   Lehman's management was required to and did certify to Lehman's stakeholders that the

15   financial statements were truthful and reliable, and that management had taken appropriate steps

16   to satisfy themselves that the disclosure processes and controls at Lehman were capable of

17   consistently producing financial information that stakeholders could rely upon.  Similarly, for

18   fiscal years 2005 and 2006, Lehman's external auditor – E&Y – was required to and did attest to

19   and report on the reliability of management's assessment of internal controls pursuant to Section

20   404 of SOX, in addition to auditing and reporting on Lehman's financial statements and internal

21   controls.  All three of these audit opinions were included in the E&Y's reports for fiscal years

22   2005 and 2006, as described below.  For fiscal year 2007, E&Y continued to audit and report on

23   Lehman's financial statements and internal controls.

24       110.    On February 13, 2006, Lehman filed with the SEC its Annual Report on Form 10-

25   K for the fiscal year ended November 30, 2005 ("2005 10-K").  The 2005 10-K was signed by,

26   amongst others, Defendants Fuld, O'Meara, Akers, Berlind, Evans, Hernandez and Kaufman.

27   The 10-K disclosed that the Company had securitized approximately $133 billion of residential

28   mortgage loans during the fiscal year.  In the 2005 10-K, the Company reported a second

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

1   consecutive year of record net revenue in the amount of $14.6 billion, an increase of 26% over

2   fiscal year 2004. In addition, the Company reported revenues from Principal Transactions of

3   $7.8 billion, net income of $3.3 billion, and diluted earnings per share of $5.43.

4        111.    The 10-K included two reports by Lehman's auditors, E&Y, addressed and

5   directed both to Lehman's Board and stockholders. In the reports, E&Y issued unqualified audit

6   opinions that (1) management's assessment that Lehman maintained effective internal control

7   over financial reporting is fairly stated, (2) Lehman maintained effective internal control over

8   financial reporting, and (3) the Company's financial statements fairly presented Lehman's

9   financial position in conformity with GAAP. E&Y asserted:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
>                         * * *
>
> In our opinion, management's assessment that Lehman Brothers Holdings Inc. maintained effective internal control over financial reporting as of November 30, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, Lehman Brothers Holdings Inc. maintained, in all material respects, effective internal control over financial reporting as of November 30, 2005, based on the COSO criteria.
>
>                         * * *
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. at November 30, 2005 and 2004, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2005, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.
>
> We also have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2005, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2006 expressed an unqualified opinion thereon.

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

112.   Similarly, on February 13, 2007, Lehman filed with the SEC its Annual Report on Form 10-K for the fiscal year ended November 30, 2006 ("2006 10-K"). The 2006 10-K was signed by, amongst others, Defendants Fuld, O'Meara, Akers, Berlind, Evans, Hernandez and Kaufman, and disclosed the company had securitized approximately $146 billion of residential mortgage loans during the fiscal year. The Company reported a third consecutive year of record net revenue in the amount of $17.6 billion, an increase of 20% over fiscal year 2005. In addition, the Company reported revenues from Principal Transactions of $9.8 billion, net income of $4 billion, and diluted earnings per share of $6.81.

113.   As before, the 10-K included two reports by Lehman's auditors, E&Y, addressed and directed both to Lehman's Board and stockholders. In the reports, E&Y issued unqualified audit opinions that (1) management's assessment that Lehman maintained effective internal control over financial reporting is fairly stated, (2) Lehman maintained effective internal control over financial reporting, and (3) the Company's financial statements fairly presented Lehman's financial position in conformity with GAAP. E&Y asserted:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> * * *
>
> In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of November 30, 2006, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2006, based on the COSO criteria.
>
> * * *
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lehman Brothers Holdings Inc. At November 30, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended November 30, 2006, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when



LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

29

considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Lehman Brothers Holdings Inc.'s internal control over financial reporting as of November 30, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 13, 2007 expressed an unqualified opinion thereon.

114.   A few weeks later, on March 14, 2007, Lehman announced its financial results for the first quarter of fiscal 2007, reporting purported "record net revenues in the Capital Markets and Investment Managements segments." According to Defendant Fuld, these "results clearly demonstrate that we are better positioned than ever to create value for [our] clients and [our] shareholders." In a conference call held that same day, Defendant O'Meara stated that Lehman was "well positioned to benefit from this evolving situation given our experience in this sector as well as our ample liquidity and risk management practices" and that Lehman expected "to see various opportunities as a result of the market dislocations." O'Meara further said that Lehman saw "the subprime challenges as being a reasonably contained situation" and downplayed Lehman's subprime exposure, stating that it accounted for less than 3% of its firm-wide revenues over the past six quarters. O'Meara also downplayed any significant impact of subprime delinquencies on the economy as a whole, stating "when you think about the subprime business, itself, it is not something that's going to itself create a big event in the economy" and "this is reasonably well contained at this point." As to Lehman's exposure, O'Meara stated, "it is subject to the same hedging principles that we talked about earlier, and it's been working quite effectively." Finally, O'Meara assured investors that Lehman's balance sheet was well-protected, stating that it "actively hedged the interest rate and credit components of [our] inventory positions including [its] non-investment grade retained interest in securitizations," "[t]he majority of which are prime mortgage related."

115.   As fiscal 2007 went on, Defendants continued to conceal Lehman's true exposure to losses from the collapsing real estate market. During the third quarter, the mortgage and MBS markets continued to deteriorate. Merrill Lynch announced a $7.9 billion writedown,

⊗
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   leaving it with a $20.9 billion portfolio of residential subprime mortgages and collaterized debt

2   obligations ("CDOs") at the end of the quarter.  Citigroup disclosed "credit and trading losses of

3   $5.9 billion on loans and mortgage-backed securities," and UBS wrote down roughly $3.7 billion

4   on its mortgage-backed securities, which totaled approximately $15.3 billion at the end of the

5   quarter.  Lehman, however, refused to reveal details about its holdings,

6   which totaled $88 billion at the end of the quarter.  For example, while Lehman disclosed on

7   September 18, 2007, that it took a net of $700 million writedown of assets, it did not say how

8   much was attributed to its mortgage-related assets.  When asked to reveal the amount of gross

9   writedowns by analysts, O'Meara replied that "knowing the gross numbers particularly in that

10   business, I don't think is really a meaningful thing."

11       116.   On November 14, 2007, Defendant Lowitt gave a presentation at the Merrill

12   Lynch Banking and Financial Services Investor Conference.  Stating that "[w]e've had success

13   in our hedging and so we don't believe that there will be any requirement for substantial

14   markdowns and certainly no requirement for us to announce anything. We're very comfortable

15   with where we are with regard to that." A few days later, on November 15, 2007, Punk Ziegel &

16   Company, issued a report and discussed Lehman's presentation, stating that:

> 17   Unlike numbers of its competitors, Lehman suggested that there will not be
> meaningful mark down. In fact, the company suggested that it was short many of
> 18   the offending securities. This would mean that Lehman could make money where
> others are losing.
>
> 19            ***
>
> 20   However Lehman went beyond these assertions suggesting that it had no major
> losses in the impacted areas for the industry. The company argued that it business
> 21   is benefiting from the problems surfacing elsewhere. In essence, as customers
> move their accounts away from impacted firms, Lehman along with Goldman
> 22   Sachs (GS/$233.31/Market Perform) is getting the business.

23       117.   Again, on December 13, 2007, when Lehman released its 2007 fourth quarter and

24   year-end financial results, Defendants continued to withhold information about Lehman's gross

25   writedowns.  For example, during an investor conference call that day, while O'Meara

26   acknowledged that Lehman wrote down its residential and commercial mortgage portfolio by

27   $1.5 billion, he refused to disclose information regarding Lehman's commercial mortgage-related

28   portfolio, stating "we're not giving that."

118. On January 10, 2008, Deutsche Bank Global Markets Research analyst Mike Mayo maintained Deutsche Bank's "Buy" rating for Lehman's stock and issued a report stating: "Our sense is that Lehman is position for market share gains given a more consistent culture, greater stability with risk management, and benefits from investment spending, especially non-U.S. (Now half of the firm)." Mayo reportedly based his recommendation on information from his meeting with Defendant Callan, stating:

> Most importantly for the long-term, Lehman has a stable culture. As opposed to several of its peers, Lehman needed no capital injection or dramatic downsizing (head count should remain flattish this year). The culture showed that risk management is effective, with business managers seeming more integrated than its peers.
>
> ***
>
> Lehman's culture of risk management starts with the CEO.... The bottom line is that the CEO seems involved in ensuring that potential upside justifies major risks that are taken.

119. On January 29, 2008, the day before the City's purchase of the Lehman note was settled, Lehman filed its Annual Report on Form 10-K with the SEC for the fiscal year ended November 30, 2007 ("2007 10-K"). The 2007 10-K included two reports by Lehman's auditors, E&Y, addressed and directed both to Lehman's Board and stockholders. In the reports, E&Y issued unqualified audit opinions that (1) Lehman maintained effective internal control over financial reporting and (2) the Company's financial statements fairly presented Lehman's financial position in conformity with GAAP. E&Y asserted:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> * * *
>
> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of November 30, 2007, based on the COSO criteria.
>
> * * *

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   In our opinion, the financial statements referred to above present fairly, in all
    material respects, the consolidated financial position of Lehman Brothers
2   Holdings Inc. At November 30, 2007 and 2006, and the consolidated results of its
    operations and its cash flows for each of the three years in the period ended
3   November 30, 2007, in conformity with U.S. generally accepted accounting
    principles. Also, in our opinion, the related financial statement schedule, when
4   considered in relation to the basic financial statements taken as a whole, presents
    fairly in all material respects the information set forth therein.
5
    We also have audited, in accordance with the standards of the Public Company
6   Accounting Oversight Board (United States), the effectiveness of Lehman
    Brothers Holdings Inc.'s internal control over financial reporting as of November
7   30, 2007, based on criteria established in Internal Control-Integrated Framework
    issued by the Committee of Sponsoring Organizations of the Treadway
8   Commission and our report dated January 28, 2008 expressed an unqualified
    opinion thereon.
9

10   Once again, Defendants failed to reveal Lehman's mortgage-related holdings, including the

11   extent and quality of its Alt-A holdings, or that its economic hedges could themselves result in

12   additional loses when the assets also declined in value.  To the contrary, despite Lehman's

13   extensive exposure, Lehman only took a total net writedown of $1.5 billion on its mortgage and

14   asset-backed holdings in the fourth quarter while its mortgage related assets exceeded $70

15   billion.

16        120.    Lehman's 2007 Form 10-K also highlighted the Company's "comprehensive risk

17   management structure" with several risk control processes in place to document "risk capacity

18   and tolerance levels" and to monitor and enforce adherence to risk control policies.  However,

19   Lehman and the Defendants failed to disclose the true risk of loss associated with Lehman's

20   mortgage-related positions.

21        121.    Indeed, according to a November 10, 2008 *Bloomberg.com* report, Lehman

22   had terminated or demoted risk managers after they raised concerns about Fuld or about

23   Lehman's mortgage-related holdings.  For example, as reported, Michael McKeever, who ran

24   investment banking, was stripped of his duties and left in 2000.  John Cecil, Chief Financial

25   Officer until 2000, was demoted to an advisor because he opposed Fuld.  Michael Gelband, head

26   of Lehman's Fixed Income Division, and Madelyn Antoncic, Lehman's Chief Risk Officer – two

27   of Lehman's best risk managers – were forced out or demoted after asking for hedges on

28   Lehman's investments.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

33

122.   However, none of this was public.  Indeed, on the same day the Form 10-K was filed, January 29, 2008, Deutsche Bank Global Markets Research analyst Mike Mayo issued a research note maintaining his "Buy" rating for the stock and stating, "[n]et, Lehman has done a good job managing its risks to date. While we believe more writedowns in leveraged loans and commercial mortgages are likely, we have confidence in management's ability to monitor these risks and take appropriate actions to mitigate potential losses."

123.   On the news, Lehman common stock rose over the next two days and closed at $64.05 on January 31, 2008, for a total gain of $3.16 per share or 5.19%

124.   On February 6, 2008, Defendant Callan participated in a Credit Suisse Financial Services Forum and boasted of the Company's discipline in risk management in the second half of 2007, including the active hedging of the residential mortgage book, which [we] started in fiscal 2006." Credit Suisse analyst Susan Roth Katzke published a report that "[ m]anagement's comments ought to increase confidence that such outperformance can continue and stated that Lehman "differentiated itself" in terms of risk management expertise in 2007. With respect to the Company's mortgage portfolio, Katzke also noted that "[w]hile there's clearly risk of near term mark-downs. Management is more confident that this portfolio will prove money good over the long term." Katzke then reiterated her Outperform rating for the Company.  The price of Lehman common stock increased $2.30 or 3.95% from its closing price of $58.18 on February 6, 2008 to close at $60.48 per share on February 7, 2008.

125.   During a conference all that same day, Defendant Callan further discussed mark-to-market adjustments the Company recorded during the quarter, stating:

> We look at the mark to market adjustments as more temporary in nature, as they reflect mark to market accounting related to the pricing of similar transactions in a liquidity constrained environment that we're living in and driven by many technical factors, which may not reflect intrinsic value.
> And I'd really like to contrast that with write-off, which are more permanent in nature and refer to impairment.  So I know there's been a lot of dialogue in recent weeks about the whole mark to market accounting mechanism, but I just wanted to highlight that this is under the mark to market accounting framework and not necessarily reflective of permanent impairment of the assets.
>
> The gross revenue reduction, gross numbers for the quarter, from mark to market, prehedges, was approximately $4.7 billion.

⊕
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

> After hedges, we had a net impact of 1.8 billion, which I think is a pretty good testament to our hedging and risk mitigation capabilities that are core to our franchise.
>
> So let me speak a moment about the composition of the net 1.8 write-down. Residential mortgage related positions accounted for 800 million, net. The 800 million net relates to 3 billion gross. So I think it's fair to say we continue to do a very, very good job managing the risk on residential mortgages, an area that I think we're credited with a lot of expertise, a great franchise.

On the news, Lehman common stock rose $14.74 per share or 46.43% from its closing price of $31.75 on March 17, 2008, to close on March 18, 2008, at $46.49, on heavy volume of 143 million shares traded.

126.   On March 31, 2008, Lehman announced the issuance of 3,000,000 shares of Preferred Stock in response to "investor interest" and to "bolster the Firm's capital and increase financial flexibility." On April 1, 2008, Lehman increased the  preferred offering by one million shares and Defendant Callan stated that "[t]he significant oversubscription for this deal demonstrates the confidence that investors have in Lehman Brothers. The success of the transaction is also reflective of the strength of the business model, the capital base and liquidity profile of the Firm as we continue to successfully weather challenging environments." The price of Lehman common stock rose 18%, increasing $6.70 to $44.34 per share.

127.   On April 8, 2008, Lehman filed its Form 10-Q quarterly report for the 2007 quarter ended February 29, 2008. The Company disclosed  financial instruments and inventory positions owned of $326.658 billion, of which $84.609 billion related to mortgages and asset-backed positions. At Lehman's Annual Shareholders' Meeting a few days later, Lehman's CEO, Defendant Fuld, reassured investors that "the worst is behind us." It certainly was not.

128.   On June 9, 2008, Lehman issued a press release announcing its financial results for the quarter ended May 31, 2008, and reported that Lehman expected a net loss for the quarter of $2.8 billion. During an analyst conference call that same day, Defendant Callan stated:

> Yes, I think to be fair the discussions at this point are not about our viability or the fact that we will be here or the fact that we have sufficient liquidity, I think we put that to bed on a number of different levels through our own actions. Obviously, to some extent through the Fed's actions.
>
> So, I don't think there is any question on the part of our any of our counterparties or lenders that they will be repaid by Lehman Brothers. I think there is a good

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   debate that's being had about the investment banking sector, its return profile as
    we move forward in a lower leveraged environment.
2
    But we are not having any conversation with counterparties or lenders about
3   whether they feel confident extending funds and credit to us.

4   In fact, during an October 23, 2008 interview with *The New York Times,* Treasury Secretary

5   Paulson later revealed: "Lehman announced bad earnings around the middle of June, and we

6   told Fuld that if he didn't have a solution by the time he announced his third-quarter earnings,

7   **there would be a serious problem.** ...  We pressed him to get a buyer."

8         129.   On June 16, 2008, Defendant Fund stated "[o]ur capital and liquidity positions

9   have never been stronger" and "So we don't believe there will be any issues around capital.

10  You've got a sense of just how strong our liquidity position is."  Lehman's shares fell to $25.14

11  on June 17, 2008, down $2.06 or 7.57% from their June 16, 2008 closing price of $27.20.

12        130.   On July 10, 2008, Lehman filed its Quarterly Report on Form 10-Q with the SEC

13  for the quarter ended May 31, 2008 (the "2Q08 10-Q").  Even at this late date, and despite the

14  growing financial crisis at Lehman, E&Y expressed no reservation about the value of Lehman's

15  assets or any scenario under which the Company might be unable to meet its obligations.

16        131.   Yet, just two months later, on September 10, 2008, Lehman released its third

17  quarter 2008 results and reported a staggering $3.9 billion loss, as well as another $7.8 billion in

18  gross writedowns on its residential and commercial real estate holdings.  Defendant Fuld quickly

19  tried to consummate a sale of Lehman to several banks.  However, unlike E&Y, the potential

20  suitors quickly determined upon access to Lehman's internal records that the value of Lehman's

21  assets had been grossly overvalued.  Unable to complete a sale, Lehman's stock price tumbled to

22  $0.21 per share.

23        132.   On September 15, 2008, Lehman petitioned for bankruptcy, the largest corporate

24  bankruptcy in U.S. history.

25        133.   In congressional hearings before the House of Representatives Committee on

26  Oversight and Government Reform, Defendant Fuld refused to take any personal responsibility

27  for Lehman's demise, attributing it instead to a "financial tsunami" – i.e., a natural disaster.

28  However, Lehman's fall in the sub-prime mortgage crisis was a man-made disaster.  Lehman was

1    not just deeply involved in the sub-prime mortgage market, it was instrumental in creating the

2    demand for the mortgages that it then packaged and swapped for enormous returns.  Indeed,

3    while Defendant Fuld blamed the market for Lehman's demise in comments to the House,

4    internal Lehman documents produced to the House Committee reveal that Lehman recognized

5    the liquidity risks created by its portfolio and blamed its own policies for its condition:

6        "•      WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?

7            •       CONDITIONS CLEARLY NOT SUSTAINABLE

8            •       SAW WARNINGS SIGNS

9            •       DID NOT MOVE EARLY/FAST ENOUGH

10               •       ILLIQUID ASSET ORIG'N TOO MUCH/TOO LONG

11               •       BEHAVED TOO MUCH INVESTORS, NOT TRADERS

12               •       NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION"

13   See Exhibit A attached hereto.  Another 2008 "Financial Supply/Demand Dynamics"

14   presentation stated: "Very few of the top financial issuers have been able to escape damage from

15   the subprime fallout" and warned that "a small number of investors account for a large portion of

16   demand [for Lehman issues], liquidity can disappear quite fast."  See Exhibit B attached hereto.

17       F.    **The Central Role Of Ernst & Young**

18       134.    E&Y served as Lehman's outside auditor for decades, including throughout the

19   relevant period.  Lehman retained E&Y to conduct quarterly reviews of its interim financial

20   results and to conduct the annual audit of the Company's fiscal results, including for fiscal years

21   ending in 2005, 2006 and 2007.  As the "independent" auditor, E&Y was responsible for

22   conducting audits on Lehman's financial statements and issuing audit reports, knowing that they

23   would be used and relied upon by prospective and existing investors of Lehman, as well as

24   analysts, in evaluating the purchase and holding of Lehman securities.  Indeed, the reports were

25   specifically addressed to Lehman's stockholders.  Thus, the City was an intended beneficiary of

26   E&Y's audit reports.

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

37

135.    By virtue of its long history with Lehman, and Defendant Goldfarb's duel affiliation as a former partner with E&Y and a member of Lehman's Executive Committee, E&Y was intimately familiar with Lehman's business model, its employees, its products, and its increasing exposure by virtue of its real estate and mortgage security holdings.  Moreover, in the course of its work, including its audit planning procedures for the audits of fiscal years 2005, 2006 and 2007, E&Y reviewed Lehman's internal controls, paying specific attention to real estate asset valuations and risk exposure.  E&Y audited large transactions and received from Lehman numerous materials concerning those transactions.  E&Y participated in drafting and reviewing Lehman's quarterly press releases, which announced Lehman's performance, financial condition, asset valuations and revenues.  E&Y reviewed drafts of Lehman's filings with the SEC prior to filing.  E&Y also attended and made presentations at Board of Director and Committee meetings, where it discussed the results of its examination of Lehman's financial statements.

136.    With respect to its audit work, E&Y provided "clean" audit opinions included in Lehman's Form 10-K for 2005, 2006 and 2007, confirming that E&Y had conducted its audit in accordance with GAAS and that based on its review, Lehman's financial statements fairly presented the Company's financial position for fiscal years 2005, 2006 and 2007, in accordance with GAAP.

137.    As noted above, these clean audit reports were critical to Lehman's ability to continue raising money from its debt offerings investments.  E&Y had unique access to the underlying information used to prepare the Company's financial statements, which was not available to the public, and was well aware that Lehman was differentiating itself from its competitors.  As reported later, in June 2008, by the New York Times:  "From the outside, it is impossible to know if Lehman is marking its assets at appropriate levels, or whether it should have taken write-downs earlier than it did.  Like other Wall Street firms, it does not disclose its specific assets, or how much it thinks they are worth.  But what is clear is that Lehman's strategy, as the subprime mortgage crisis unfolded and expanded, was to seek to differentiate itself as being so well managed that it would not have the problems other firms might have."

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

138.     E&Y was also well aware that investors, like the City, were relying on it to investigate and confirm that Lehman's financial condition was accurately reported.  E&Y promoted itself as one of the foremost accounting firms in the world, with special experience in real estate and sophistication in accounting for complex capital markets.  For example, E&Y's website touted its Global Real Estate Center and dedicated professionals offering "deep technical experience" in accounting rules applicable to real estate assets and the most critical audit risks.  E&Y also promoted its multi-disciplinary business to address the particular risks for audit clients invested in real estate, combining the skills of audit, tax, advisory and valuation professionals, and that it provided services to 31% of all publicly traded real estate investment trusts ("REITS"), more than 50 of the leading real estate investment funds (including those sponsored by Lehman), and 7 of the 10 largest homebuilders in the United States.

139.     Similarly, E&Y recognized that prospective and existing investors in Lehman, like the City, were the intended beneficiaries of its work, and specifically addressed their reports both to Lehman's Board *and* to its stockholders.  Similarly, in the firm's 2007 Global Review, E&Y's Chairman and Chief Executive Officer, Jim Turley, lauded the firm's unique understanding of the complex world of capital markets, and its assiduous pursuit of conservative asset valuation policies for the benefit of *investors*:

> We're bringing *the right level of financial skepticism to critical areas such as fair-value determinations, reserving, off-balance sheet structures, and liquidity*. We're requiring consultation with our professional practice leaders on significant or unusual matters.  We're focusing attention on events that occur in these volatile markets subsequent to the date of financial statements.  And we're carefully reviewing *client disclosures for timeliness and transparency*.
>
> * * *
>
> As a profession we are very aware that when we are performing an audit *we are working for the owners of the business – the investors – and not the management*.  And so we see it as our responsibility to engage with our stakeholders, and to speak out and provide leadership on important public policy maters affecting the capital markets.

See Exhibit C attached hereto, emphasis added.

1    140.   E&Y's knew that the entire point of an audit is to protect the Company's

2    *investors*, who do not have access to inside information.  This is consistent with the United

3    States Supreme Court's pronouncement relating to the special "public watchdog" role of an

4    accountant in assuring the accuracy of financial statement:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a ***public responsibility transcending any employment relationship with the client***.  The independent public accountant performing this special function owes ***ultimate allegiance to the corporation's creditors and stockholders, as well as the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust***.  To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charges with public obligations.

*U.S. v. Arthur Young & Co.* (1984) 465 U.S. 805, 817-18 (emphasis added); *accord Bily v.*

*Arthur Young & Co.* (1992) 3 Cal.4th 370, 383-84; *National Medical Transp. Network v.*

*Deloitte & Touche* (1998) 62 Cal.App.4th 412, 428-29.

14    141.   E&Y was also well aware of the particular audit risks at Lehman, given the

15   investment bank's extensive real estate-related assets.  Whereas safe and sound banking practice

16   requires reserves that reflect losses inherent in a loan portfolio, higher reserves means lower

17   reported earnings.  A basic principle of financial accounting standards requires not only accurate

18   financial statements, but also the recording of loan losses.  Thus, E&Y recognized the risk of

19   nonpayment, especially of subprime loans, as well as the risk of a downturn in the economy and

20   the dangers of an overconcentrated investment in mortgage-backed securities.  Indeed, the risks

21   inherent in securitizations of debt were known to auditors for years.  Though seen as a way to

22   remove loans from the originating bank's balance sheet, securitization programs in many cases

23   also had the effect of masking true risk and creating a system in which loan quality became

24   secondary to quantity.

25    142.   E&Y also recognized the audit risk created by Lehman's exposure to even a

26   minor downturn in the market, and the fact that Lehman's competitors had decided to take

27   recognize large losses on similar assets.

28

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

143.   In addition, E&Y recognized that Lehman's management had a built-in incentive to inflate Lehman's financial condition and the value of its assets, given the Company's compensation structure.  Indeed, the Officer Defendants stood to receive <u>massive</u> bonuses and other rewards under the Company's compensation plans, directly tied to short-term benchmarks such as  percentage increases in Lehman's fiscal 2007 net revenues, pretax income, net income, and earnings per share over fiscal 2006.  Lehman also awarded additional compensation to executives for purportedly "[s]uccessfully navigating the difficult credit and mortgage market environments and maintaining the Firm's strong risk controls."

144.   As a result, according to Forbes.com, Defendant Fuld was the 11th highest paid CEO in the United States in fiscal 2007, receiving a total of $71.90 million.  His 5-year compensation totaled over $350 million or approximately $70 million per year.  In the Company's March 5, 2008 Proxy Statement, Fuld's compensation for Fiscal 2007 was purportedly justified, by "his role in leading the Company through the challenging market environment, and orchestrating the Company's strategic direction and objectives including the continued diversification of the Company across businesses, regions and products which was important to the Company's financial performance in Fiscal 2007."  The other Officer Defendants also were rewarded handsomely, collectively earning tens of million of dollars in salary and bonuses for fiscal year 2007.

145.   However, contrary to its public statements and its professional duties to Lehman's investors, E&Y failed to design or perform its audit in a manner to account for these audit risks, and therefore was unable to provide unqualified opinions regarding Lehman's financial statements.

146.   The entire purpose of an audit is to obtain an opinion that the financial statements fairly present, in all material respects, the financial position of the company in conformity with accounting principles generally accepted in the United States ("GAAP").  These principles are further clarified by Statements on Auditing Standards ("SAS") that are referred to with an "AU" number.  The auditor has the affirmative duty to plan and perform the audit to obtain *reasonable*

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    *assurance* that the financial statements are free of material misstatement, whether caused by

2    error or fraud.  AU 110.02.

3        147.    To obtain such reasonable assurance, the independent auditor has to perform

4    specific procedures called for by GAAS and, after performing such procedures, determine if

5    anything came to his or her attention that would lead them to believe that the financial statements

6    were not fairly presented in accordance with GAAP.  AU 722.09.  Indeed, the audit process

7    *requires professional skepticism* in order to properly test management's representations so that

8    the auditor actually has a reasonable basis on which to form an opinion regarding the financial

9    statements.  AU 333.02.  The audit opinion is valuable precisely because the auditor is

10   supposedly conducting an *independent* and *skeptical* examination of the information provided by

11   management.

12       148.    Thus, the auditor must consider both audit risk and materiality in (1) planning the

13   audit and designing audit procedures, and (2) in evaluating the results of the audit in relation to

14   the financial statements as a whole.  AU 312.12.  The auditor must plan the audit to obtain

15   reasonable assurance of detecting material misstatements that it believes could be large enough,

16   individually or in the aggregate, to be quantitatively material to the financial statements.  AU

17   312.20.

18       149.    E&Y failed to adhere to these basic accounting principles.  As a result, its audit

19   reports misrepresented the true financial condition of Lehman and misrepresented that it had

20   conducted its audits in compliance with professional standards of care.  In performing its audit

21   work for Lehman, E&Y agreed and had a duty to perform such work in conformity with GAAP,

22   as well as the standard of care established by the American Institute of Certified Public

23   Accountant ("AICPA"), including the GAAS' Ten (10) Professional Standards of Care:

24       *General Standards*

25       1. The audit must be performed by a person or persons having adequate technical training
         and proficiency as an auditor.

26
27       2. In all matters relating to the assignment, an independence in mental attitude is to be
         maintained by the auditor or auditors.

28

3. Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

*Standards of Field Work*

4. The work is to be adequately planned and assistants, if any, are to be properly supervised.

5. A sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

6. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

7. The report shall state whether the financial statements are presented in accordance with Generally Accepted Accounting Principles.

8. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

9. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

10. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

150.    Based upon its annual audit and quarterly reviews, E&Y knew or recklessly disregarded the true financial condition and exposure of Lehman, the value of Lehman' real estate loan "assets," the true credit risk of debt securities sold to investors like the City, and Lehman's deteriorating financial condition, which contradicted the unqualified audit reports on Lehman's financial statements meant to be distributed to the market and to Lehman shareholders. E&Y's reports used by Lehman to promote its securities to the market were issued in clear violation of professional standards and fiduciary duties.

151.    Based upon its annual audit and quarterly reviews, E&Y also knew or should have known about the inadequate internal control structure. Indeed, E&Y discussed with Lehman's management, including the Board and Committees, responsibility for establishing and

maintaining adequate internal controls for Lehman and for ensuring that the Company's financial statements were based on accurate financial information, including that Lehman:

    (a)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (b)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (i)    transactions are executed in accordance with management's general or specific authorization;

        (ii)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

Nonetheless, E&Y certified Lehman's financial statements, while knowing that Lehman's internal controls were inadequate.

152.    The misstatements of Lehman's quarterly and annual financial statements were material and in violation of GAAP. E&Y breached its professional responsibilities and acted in violation of GAAP and GAAS in its review of the above-specified quarterly financials and audits of the annual financial statements of Lehman.

153.    E&Y violated GAAS General Standard No. 3, which requires the auditor to exercise due professional care in the performance of the audit and preparation of the audit report.

154.    E&Y violated GAAS Reporting Standard No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP. E&Y's audit opinion falsely represented that Lehman's financial statements complied with GAAP. For example, E&Y and the other Defendants failed to comply with FAS 157, which required that financial instruments and other inventory positions must be reported at fair value.

155.    E&Y violated GAAS Field Standard No. 1, and the standards set forth in AU sections 310, 320, 327, and others, by failing to adequately plan its audit and properly supervise the work of assistants so as to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements.

156.   E&Y violated AU section 316, which requires the auditor to plan and perform its examination of the financial statements with professional skepticism.  Section 316 begins with the statement that: "the auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU §316.01.  In Lehman's case, there were numerous audit red flags and risk factors that alerted E&Y to the potential of misstatements.

157.   E&Y failed to expand its audit procedures and perform effective audit testing to obtain more reliable, persuasive audit evidence because of the above-described significant risk factors and audit red flags.  As section 316 states, "[t]he nature of audit procedures may need to be changed to obtain evidence that is more reliable or to obtain additional corroborative information.  For example, more evidential matter may be needed from independent sources outside the entity."  E&Y failed to obtain adequate confirmations and/or otherwise communicate directly with affiliates of Lehman regarding the true value and exposure from Lehman's real estate assets and failed to fully understand the relationships between the parties, despite knowledge of risk factors and audit red flags that required action on E&Y's part.  Section 316.27, which discusses the need to exercise professional skepticism in response to the risk of material misstatement, directs: (a) increased sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions, and (b) increased recognition of the need to corroborate management explanations or representations concerning materials matters.

158.   E&Y violated AU section 722, which requires the auditor to ensure that the Audit Committee of the Board of Directors is aware of, and responds appropriately to, any irregularities that the auditor discovers as part of a review of interim financial information to be filed with a regulatory agency, such as the SEC.

159.   E&Y violated AU section 722.18, which states: "If, in performing a review of interim financial information, the accountant becomes aware of information that leads him or her to question whether the interim financial information to be reported conforms with generally accepted accounting principles, the accountant should make additional inquiries or employ other

1  procedures he or she considers appropriate to provide the limited assurance for a review

2  engagement."  In view of all the previously described risk factors and audit red flags at Lehman,

3  E&Y should have made additional inquiries, including further communications with customers

4  and other related parties, as described above.

5       160.   By giving of the unqualified audit opinions for the Lehman financial statements

6  for fiscal years 2005, 2006 and 2007, E&Y certified that its audit of Lehman's books and records

7  was done in accordance with GAAP and GAAS.  It was not.  Thus, E&Y's statements were

8  materially misleading.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Fraud and Deceit)

161.    Plaintiff incorporates and realleges each of the foregoing paragraphs, as though fully set forth herein and further alleges as follows.

162.    Defendants, and each of them, made material representations and omissions to Plaintiff which were false and misleading, including those contained in press releases, public statements, financial statements, SEC filings, registration statements, offering documents and other disclosures made by Defendants, described above.

163.    Defendants failed to disclose Lehman's exposure to loss from its mortgage-related investments and its failure to write down mortgage-related assets to reflect their true fair value.  Moreover, Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging activities exposed investors to additional losses.  In addition, Defendant E&Y issued unqualified audit reports on Lehman's financial statements in 2005, 2006 and 2007, which they knew and intended would be read and relied upon by prospective and existing investors in Lehman securities, like the City, and which were in fact read and relied upon by the City in making its investment decisions.

164.    When Defendants, and each of them, made the representations and failed to disclose and suppressed information they had a duty to disclose, as set forth hereinbefore, Defendants had knowledge of the falsity of their statements and representations and knew that they were failing to disclose material facts which they had a duty to disclose.

165.    Defendants made the misrepresentations and omitted the material facts with the intent to defraud Plaintiff and to induce Plaintiff to purchase and hold Lehman securities.

166.    At the time these misrepresentations were made and the material facts not disclosed, and at the time that Plaintiff took the actions herein alleged, Plaintiff was ignorant of the true facts.  If Plaintiff had known the true facts, it would not have invested in or continued to hold Lehman securities.

167.    Plaintiff reasonably relied on these representations, including E&Y's unqualified audit reports, in investing in and continuing to hold Lehman securities and its reliance was justified since the Defendants concealed the true facts.

168.    Defendants knew that a fraud was occurring in the representations about Lehman. Notwithstanding their knowledge of this improper and unlawful conduct, these Defendants, and each of them, engaged in conduct, hereinbefore described which rendered substantial assistance to, encouraged and/or aided and abetted the fraud.

169.    With knowledge of the unlawful purpose of the fraud, Defendants, and each of them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took steps to further that scheme.

170.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

171.    The aforementioned acts of Defendants, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation)

172.    Plaintiff incorporates and realleges each of the foregoing paragraphs, as though fully set forth herein and further alleges as follows.

173.    Defendants, and each of them, negligently made material representations to Plaintiff which were false and misleading, including those contained in press releases, public statements, SEC filings, financial statements, registration statements, offering documents and other disclosures made by Defendants, described above.  Defendants failed to disclose Lehman's exposure to loss from its mortgage-related investments and its failure to write down mortgage-related assets to reflect their true fair value.  Moreover, Defendants failed to disclose that certain mortgage-related assets, including Alt-A mortgages, could not be effectively hedged to mitigate losses, and that Lehman's hedging activities exposed investors to additional losses.  In addition,

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

48

1  Defendant E&Y issued unqualified audit reports on Lehman's financial statements in 2005, 2006
2  and 2007, which they knew and intended would be read and relied upon by prospective and
3  existing investors in Lehman securities, like the City, and which were in fact read and relied upon
4  by the City in making its investment decisions.

5       174.   When Defendants, and each of them, made the representations, as set forth
6  hereinbefore, Defendants had no reasonable ground for believing them to be true.  Defendants
7  made positive assertions in a manner not warranted by the information in their possession.
8  Defendants made these assertions to induce the reliance of Plaintiff and to induce Plaintiff to
9  purchase and hold Lehman securities.

10       175.   At the time these misrepresentations were made and the material facts not
11  disclosed, and at the time that Plaintiff took the actions herein alleged, Plaintiff was ignorant of
12  the true facts.  If Plaintiff had known the true facts, it would not have invested in or continued to
13  hold Lehman securities, and would have disposed of them immediately.

14       176.   Plaintiff reasonably relied on these representations, including E&Y's unqualified
15  audit reports, in investing in and continuing to hold Lehman securities and its reliance was
16  justified.

17       177.   Defendants, and each of them, engaged in conduct, hereinbefore described which
18  rendered substantial assistance to, encouraged and/or aided and abetted the others' conduct.

19       178.   With knowledge of the unlawful purpose of the fraud, Defendants, and each of
20  them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took
21  steps to further that scheme.

22       179.   As a direct and proximate result of the wrongful conduct of each of the
23  Defendants, Plaintiff has suffered and will continue to suffer economic losses and other general
24  and specific damages, all in an amount to be determined according to proof.

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

### THIRD CAUSE OF ACTION

#### (Breach of Fiduciary Duty)

180.   Plaintiff incorporates and realleges each of the foregoing paragraphs, as though fully set forth herein and further alleges as follows.

181.   By virtue of Plaintiff's ownership of the securities that are the subject of this Complaint, the Individual Defendants, and each of them, as officers and directors of Lehman, owed fiduciary duties of the highest good faith, integrity and fair dealing to Plaintiff as holders of the securities. The Individual Defendants, and each of them, further owed fiduciary obligations to Plaintiff as they sought to induce, knowing its particular circumstances, and did induce Plaintiff to purchase and hold the securities.

182.   The Individual Defendants and each of them, had insider knowledge of adverse non-public information regarding the securities as alleged above. Defendants knowingly and intentionally concealed this adverse non-public information from the Plaintiff.

183.   The Individual Defendants, and each of them, breached and violated their fiduciary obligations to Plaintiff, to the detriment of Plaintiff, by failing to disclose all material information known to them at the time that Plaintiff purchased the securities, and by making the above-mentioned misrepresentations to induce Plaintiff to purchase and hold the securities or to take other actions.

184.   As set forth above, the Individual Defendants and Defendant E&Y knew that Lehman was engaged in fraudulent conduct, and that Lehman was breaching its fiduciary duty to its shareholders. Notwithstanding their knowledge of the improper and unlawful conduct, the Defendants, and each of them, engaged in conduct, hereinbefore described which rendered substantial assistance to, encouraged and/or aided and abetted the breach of fiduciary duty.

185.   With knowledge of the unlawful purpose of the conduct of Lehman, the Defendants, and each of them, entered into an agreement to accomplish the aforesaid scheme, and by their actions took steps to further that scheme.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

50

186.   As a result of the wrongful conduct of each of the Defendants, Plaintiff has suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

187.   The aforementioned acts of Defendants, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Violation of California Corporations Code § 25400 *et seq.*)

188.   Plaintiff hereby realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein and further alleges as follows.

189.   Defendants, and each of them, acting individually and pursuant to a scheme and conspiracy, directly and indirectly, induced the purchase and retention of the securities by the Plaintiff by circulating or disseminating, in or from California, information that falsely described Lehman's financial condition and exposure, as described above, for the purpose of inducing Plaintiff to purchase and hold the securities.  Defendants knew or had reason to believe that their statements were false or misleading in light of the circumstances under which they were made.  As a result of the misrepresentations, Defendants knew that investors like Plaintiff would be misled and would purchase and hold securities based upon false information. Despite this knowledge, Defendants continued to make the misrepresentations in order to induce investors to purchase and hold securities.

190.   Defendants, and each of them, also knowingly provided substantial assistance to the other Defendants in violation of the Corporations Code Section 25403.

191.   Defendants, and each of them are liable for wilfully participating in acts or transactions in violation of Corporations Code Sections 25400 and 25403, and thus are liable to Plaintiff, which purchased its securities at a price which was affected by Defendants' acts, for damages sustained by Plaintiff as a result of such acts or transactions.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

Complaint

51

192.    As a direct and proximate result of the wrongful conduct of Defendants and each of them, Plaintiff has sustained economic losses and other general and special damages, including damages pursuant to Section 25500, in an amount to be determined according to proof at the time of trial.

193.    Plaintiff is entitled to an award of prejudgment interest at the legal rate on their economic damages, pursuant to Section 25500.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Violations of Section 11 of the Securities Act)

194.    Plaintiff incorporates and realleges each of the foregoing paragraphs, but excluding any allegation of fraudulent intent, as though fully set forth herein and further alleges as follows.  This claim does not sound in fraud, and neither fraud nor scienter is an element of this claim.  This claim is not alleged against Defendant E&Y.

195.    Plaintiff purchased Lehman securities issued pursuant to a registration statement.  Plaintiff purchased or acquired these securities pursuant to, or traceable to, registration statements signed by or on behalf of Defendants or which identified those individuals as officers or directors of Lehman.

196.    The registration statements, at the time they were issued and became effective, were inaccurate and misleading, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements made therein not misleading, as set forth above.  The matters detailed above would have been material to a reasonable person reviewing the registration statements and the financial statements incorporated therein.

197.    Defendants were responsible for the contents and dissemination of the registration statements and are liable under Section 11 of the Securities Act for any material misrepresentations or omissions contained therein.  Defendants did not make a reasonable investigation and did not possess reasonable grounds for believing that the statements contained in the registration statements were true, did not omit any material fact, and were not materially misleading.

198.   Plaintiff did not know or in the exercise of reasonable diligence could not have known of the misstatements and omissions of material fact contained in the registration statements.

199.   Plaintiff has sustained damages as a result of the misstatements and omissions of material fact contained in the registration statements for which it is entitled to compensation.

200.   Defendants owed the purchasers of the securities, including Plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the registration statements at the time they became effective, to ensure that they were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, Defendants knew or should have known of the material misstatements and omission contained in the registration statements. Moreover, these Defendants knew of the misconduct of the other Defendants and failed to advise the Plaintiff of this misconduct.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (For Violations of Section 15 of the Securities Act)

201.   Plaintiff incorporates and realleges each of the foregoing paragraphs, but excluding any allegation of fraudulent intent, as though fully set forth herein and further alleges as follows.

202.   Plaintiff asserts this cause of action against Defendants under Section 15 of the Securities Act.  This claim does not sound in fraud, and neither fraud nor scienter is an element of this claim.  This claim is not alleged against Defendant E&Y.

203.   Defendants, by reason of their management positions, membership or representations on Lehman's board of directors, or stock ownership, were controlling persons within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o.  Defendants had power, influence and control, and exercised it to cause Lehman to engage in the violations of law complained of herein.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

Complaint

53

1    204.    Accordingly, Defendants are liable under Section 15 of the Securities Act.

2    205.    As a result of Defendants' wrongdoing, Plaintiff has suffered damages, in an

3    amount to be determined at trial.

4    WHEREFORE, Plaintiff prays for relief as set forth below.

5    **VI.    PRAYER FOR RELIEF**

6    1.    Compensatory and general damages according to proof;

7    2.    Special damages according to proof;

8    3.    Restitution according to proof;

9    4.    Prejudgment interest at the maximum rate;

10   5.    Punitive and exemplary damages according to proof;

11   6.    Costs of the proceedings herein;

12   7.    Reasonable attorneys fees; and

13   8.    All such other and further relief as the Court deems just and proper.

14   **VII.    DEMAND FOR JURY TRIAL**

15   Plaintiff demands a trial by jury.

16

17   Dated: February 17, 2009          COTCHETT, PITRE & McCARTHY

18

19                                     By: _____

20                                         GERALD S. OHN

21                                     *Attorneys for Plaintiff*
                                       *The City of Auburn*

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

Complaint

54

# EXHIBIT A

- WHAT HAPPENED & WHY
- NEAR TERM – WHAT WE HAVE DONE & MUST DO
- LONGER TERM – WHERE INDUSTRY AND FIRM GOING

- WHAT HAPPENED...
  - MONT'RY POL: MANAGE RELATION INT RATES, GDP, INFL
  - COUPLE SIGNIFICANT SHOCKS – DOT-COM, 9/11
  - POLICY WENT TOO LOOSE; RATES TOO LOW, TOO LONG
  - ASSET PRICE↑, LEV↑, COMPLEXITY↑, PRICE OF RISK↓
  - 2007: RISING RATES → SEVERE DISLOCATION
  - SLOW CEN BNK RESP →LIQUID PROB → ASSET QUAL PROB

- WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?
  - CONDITIONS CLEARLY NOT SUSTAINABLE
  - SAW WARNING SIGNS
  - DID NOT MOVE EARLY/FAST ENOUGH
    - ILLIQUID ASSET ORIG'N TOO MUCH/TOO LONG
    - BEHAVED TOO MUCH INVESTORS, NOT TRADERS
  - NOT ENOUGH DISCIPLINE ABOUT CAPITAL ALLOCATION

CONFIDENTIAL

LB 011894

# EXHIBIT B



cial Supply/Demand

LEHMAN BROTHERS

CONFIDENTIAL

LB 010443



Very few of the top financial issuers have been able to escape damage from the subprime fallout . . .

CONFIDENTIAL

And a small number of investors accounting for a large portion of demand, liquidity can disappear quite fast . . .



LEHMAN BROTHERS

14

CONFIDENTIAL

LB 010455

# EXHIBIT C



Global Review
2007

Ξ!! ERNST & YOUNG
Quality In Everything We Do

**Jim Turley**
Chairman and Chief Executive Officer



2

# Chairman's letter

## Achieving potential — making a difference

The forces shaping Ernst & Young today are those that are shaping our world as a whole: continued globalization stimulated by the ongoing rise of the emerging markets; the introduction of new financial and investment models; dramatic demographic shifts; and innovative technologies. What do these changes mean for the world economy, for people, for our profession and for our own organization? How can we address the challenges they present to business and society? How can we help people and companies capitalize on the opportunities?

At Ernst & Young we think about things broadly — about the world around us; about all the potential that exists everywhere, and then about our place in the world. Over the last 15 years, billions of people have joined the global economic system. This influx has remade the world. Barriers have lowered. Wealth has increased. And the potential these people represent has just started to be fulfilled.

Understanding the potential in the world around us is just our starting point. The challenge that we set for ourselves is to go beyond identifying potential, to actually making a difference. A difference for our clients, for the companies we serve, and for society as a whole.

It all starts with our own people — 130,000 talented individuals whose aspirations are as diverse as the people themselves. Our goal is to help each one of them to reach their personal and professional goals and find fulfillment in their work, in an organization known for having the best teaming culture in the profession.

In turn, our people ensure the success of our organization, by delivering their highest quality work for our clients. That quality work is the responsibility of everyone at Ernst & Young. We recognize it is critical to building confidence in our profession and the capital markets, as well as to enhancing our own reputation.

For the clients we serve, we also focus on making a difference. Through the services we deliver — whether assurance, tax, transactions or advisory — we help our clients earn the confidence of investors, better manage their risks, strengthen their controls, improve aspects of their business and increase their value. Our client work makes a difference for everyone who participates in the capital markets, from the regulators who oversee them, to workers counting on their livelihood and pensions, to investors everywhere.

But the impact we have goes further than our people and our clients; it extends to the communities in which we live. In the emerging markets, we donate our time to promote entrepreneurship and sound corporate governance, and to attract foreign investment. In each of the communities in which we live and work, we make a difference through not only the contributions of our financial resources, but also the substantial volunteering of the time and talents of our people. Often, such efforts are focused on building financial literacy and enhancing access to educational opportunities for people around the world. In this way we can leverage our own organization's world-class capabilities for the benefit of the world around us.

During the 2007 financial year, Ernst & Young again enjoyed solid financial success. Our worldwide revenues increased to US$21.1 billion, representing a year-on-year increase of US$2.7 billion and a growth rate of 15%. This strong financial performance was achieved through the dedicated efforts of our people and each one of them should take pride in the result. I am proud of each of them and want to thank them all.

Striving to make a difference, and knowing you are making a difference, is perhaps the most fulfilling feeling one can have. What inspires me the most is the way our people rally around our sense of purpose. For that I am truly grateful.

James S. Turley

Jerome S. Turley
Chairman and Chief Executive Officer
Ernst & Young

# Chairman and CEO Jim Turley on the issues facing business, our profession, and our organization.

Jim, you spend a lot of your time traveling and speaking with business leaders around the world. How are they feeling about the global economy and business today?

From the people I speak with, I'd say there's a cautious optimism out there. There's a positive feeling that the economic fundamentals remain strong across many regions. There's also recognition that globalization is having many positive effects — creating wealth and improving people's lives — particularly in the emerging markets.

However, there remains a high degree of uncertainty and risk aversion in the financial markets and in the banking sector. The turbulence is a long way from settling out — and I don't think it's possible for anyone to say right now just what the long-term effects are going to be. But there is also a general sense that the world economy is better able to deal with events such as the credit crunch than it used to be.

Let me just add that most leaders today see that we are in a period of profound transformation globally. The economic rebalancing that is occurring among developed, developing and emerging markets, and the societal challenges we face have a lot of business leaders taking a much harder look at the role of their own business in society and have countries re-examining their own role in the global economy.

How has the accounting profession reacted to the credit crunch?

There's no doubt that the situation we have in the credit markets is extremely complex — and it really shows us yet again how economic or business activity in one part of the world can so quickly have a global impact. Whatever its root causes, there's no question that the credit situation is causing deep concern in the markets. As for our profession, we've recognized this, and we've been taking an active role trying to help provide businesses and investors with greater clarity and transparency on some of the issues involved.

In October, the Center for Audit Quality — the CAQ — a US public-policy body that I chair, issued white papers on accounting issues related to the credit situation under US GAAP. The Global Public Policy Committee, or GPPC, a global body comprising the six largest audit organizations, also issued a similar paper in December, relating to IFRS. I think these are real contributions in challenging times. They help to clarify the appropriate accounting treatments and, more importantly, they help to give investors a greater sense of confidence in the consistency of the financial information they rely on to make their investment decisions. From the reactions we got to the papers, it was clear to me that investors appreciated hearing our voice and drew some comfort from it.

In terms of our client work, we've strengthened our global protocols and methodologies to carefully consider the effects on our clients' financial condition and prospects in all sectors and

jurisdictions. We're bringing the right level of financial skepticism to critical areas such as fair-value determinations, reserving, off-balance sheet structures, and liquidity. We're requiring consultation with our professional practice leaders on significant or unusual matters. We're focusing attention on events that occur in these volatile markets subsequent to the date of financial statements. And we're carefully reviewing client disclosures for timeliness and transparency. Personally, I've been pleased to see the profession — and Ernst & Young — take such a robust and comprehensive approach to what is clearly an issue of global importance.

In the changing world you describe, what role does the accounting profession play?

Our profession plays a critical role in the world's financial markets. And people everywhere are realizing more and more that the work that we do has a big impact on their lives — on the companies where they work, on the investments that they make, on the pensions on which they depend, as well as on the capital markets and the global economy as a whole. Our work gives people a sense that financial information is being presented fairly according to a common set of rules, whether that is accounting, tax, or transactions rules.

Over the last decade we've moved from being largely self-regulated to being a regulated and highly scrutinized profession. That's been good for us. We've welcomed this increased oversight of our work. We've renewed our commitment to quality. And we're working closely with regulators worldwide to what I believe is the benefit of both investors and our clients everywhere.

What is the biggest threat your profession faces?

Well, I think I need to distinguish between what I'd consider a challenge and what I'd call a threat. In this case they're separate issues — but they're both related to trust. If you're talking about challenges that our profession faces, the biggest one has to be finding and mobilizing enough high-quality people around the world to meet the needs of our clients. This is especially true in markets such as China, where demand for our services is growing at an amazing rate, but is true in developed markets as well.

In terms of threats, I think the major one is the lack of respect for professional judgment in some countries. Over the long run, this can really undermine the relevance of what we do. It can also knock the pride of our people. An auditor's exercise of independent professional judgment is a vital component of the important work that auditors perform for the capital markets and the investing public. The information presented in financial statements is in part the result of a series of estimates and judgments made by management. Auditors must be willing to take a stand on behalf of investors when they

4

"Our business strategy is s    e. Have
the best people. Provide the best quality.
Success follows."

disagree with the estimates or assessments made by management
in arriving at the numbers presented in the financial statements.
And regulators and the legal system must be able to respect
good-faith professional judgments — judgments that are
rational, well-considered, and documented.

Does the current financial reporting model need reform?
Yes. The current financial reporting system has served us very well,
but it was built for a different time — a time that was much less global,
a time that had financial instruments and models that were much less
complex, and a time that was much less technology-enabled. Today
investors are demanding financial reporting that not only can they
trust, but also reflects today's fast-moving marketplace. Businesses
are trying to find the right ways to express the value of their ever more
sophisticated operations. And regulators are seeking to preserve the
integrity and stability of increasingly complex systems.

Over the past year, our profession has been conducting dialogues
with stakeholders around the world to discuss what the future of
financial reporting should look like. What is clear is a consensus on
the need for change. What that change should look like will take a lot
more discussion and effort.

One thing on which many stakeholders do agree is that there is a
compelling need for more consistency across national boundaries
— in most everything. Companies today operate around the world,
investors invest across borders, and what happens in one market can
be felt in another on the opposite side of the world in the blink of an
eye. But we still have inconsistent and overlapping financial
accounting standards, auditing standards and oversight regimes.
These kinds of inconsistencies are inefficient, confusing and
increasingly outmoded in today's global market. As I have said
in many forums, it is time to really address this issue.

So are you calling for convergence? That's a topic, especially in terms
of IFRS and US GAAP, which has attracted a lot of attention this year.
No. I want to make it clear that I am not calling for convergence of
accounting standards. When people talk about convergence what
they usually mean is moving different standards closer to each other.
What I am calling for is the US to adopt International Financial
Reporting Standards. Establishing a date certain for that shift from
US GAAP to IFRS would enable US companies to begin preparing now
and would provide the impetus to confront the required legal and
regulatory changes that will be necessary to precede the shift to the
more principles-based IFRS. It would promote similar moves by other
countries to embrace these international standards instead of
modifying them for their own local use. This would help countries

establish and work toward the improvement of a single standard,
rather than devoting their energy to tweaking national standards to
make them look more like IFRS. And it would motivate universities to
train tomorrow's accountants in IFRS.

I wrote an opinion piece in the 9 November 2007 edition
of The Wall Street Journal that explains my views in more depth.
I think such truly global standards would bring greater efficiency
to companies that currently have to pay internal and external legal
and accounting experts to help them sort through accounting
differences across multiple jurisdictions. And for investors, global
standards would bring a new level of comparability and reliability
for global investments. We just need to get on with it.

What are the keys to achieving your stated promise to the market of
seamless, consistent, high-quality client service, worldwide?
Over the last several years, we have steadily strengthened our global
organization to enable us to deliver on the promise we make to the
market — to deliver seamless, consistent, high-quality client service,
worldwide. This involves bringing together our 130,000 people, across
140 countries, through seven tightly integrated geographic Areas, in
a controlled way in which we can truly meet the demands of our highly
complex, global clients. We have aligned our infrastructure and
streamlined our processes so we can focus our attention on meeting
the unique demands of our clients anywhere and everywhere around
the world.

However I think what gives us our competitive advantage is
something more — our culture of teaming and inclusiveness, our
global mindset, and our values-based commitment to our clients
around the world. These "softer" things are what I see as critical.

You've seen strong growth in Tax this year. Given the continued
sensitivities toward tax planning around the world isn't this surprising?
No, not when you consider how important tax issues are to global
business, and the ways in which we have reoriented our tax practice,
especially our tax advisory services. We have increased our focus on
client relationships and our clients' most pressing business issues,
while always remaining mindful of all of our responsibilities to broader
stakeholders, including the tax authorities and capital markets
regulators. We are helping our clients to focus on ways in which they
can balance appropriate management of their tax costs and their
responsibilities, and this is having positive results. Finally, we have
engaged with the OECD's Forum of Tax Administrators, allowing
us to move beyond compliance with national tax authorities into
a constructive conversation with them. I'd like to see us continue
this journey in the future.

5

The growth of your advisory services is outpacing the growth of your audit business. Are you heading back into consulting?

'Consulting' is a very broad and no longer particularly helpful term. It covers many services from business strategy through to implementation and outsourcing. Some parts of consulting – such as providing advice on risk management, process enhancement or performance improvement – not only sit well with the Ernst & Young brand but positively enhance our ability to deliver high-quality service to all our clients. These businesses are totally complementary to our other core businesses such as assurance, tax and transactions and are therefore central to our development plans for the future.

Other parts of the consulting market – such as systems implementation or outsourcing – require a different business model from our own. That was the consulting business we sold to Cap Gemini in 2000 and which we do not intend to re-enter. We have a depth and wealth of IT advisory expertise – we need it for both assurance and advisory services – but are not involved with IT system implementation or IT outsourcing.

Around the world Ernst & Young is recognized for being a great place to work. How are you making that happen?

Well, first I have to emphasize that smart, motivated people are the foundation of our organization. So our business strategy is simple. Have the best people. Provide the best quality. Success follows. Attracting those people means providing a great place to work, and that's all about creating the right culture. What I hear from people who join us is how all of us – from senior leaders to interns – will take the time to listen to and engage with each other, and respect each other's views. That's important to us because we know that, in most cases, our people have the answers to whatever question or challenge we have. We need to be humble enough as an organization to listen to diverse ideas.

And our people understand that they are working in an organization where they make a difference – for each other, for our clients, for the financial markets and for the communities in which they live and work. It's really important to them. Not only in their professional lives, but in their personal lives as well.

While I'm happy that we are recognized for this culture in countries all over the world, I don't think that this is an area where we would ever rest on our laurels. Maintaining our diverse, inclusive culture is something we always work on and try to improve.

Earlier you mentioned chairing the Center for Audit Quality, and an opinion piece in *The Wall Street Journal*. Why are you speaking out more these days on accounting and business issues?

It's not just me speaking out. As a profession we are very aware that when we are performing an audit we are working for the owners of the business – the investors – and not the management. And so we see it as our responsibility to engage with our stakeholders, and to speak out and provide leadership on important public policy matters affecting the capital markets. After all, we can't expect to be both relevant to the capital markets and mute. We have to engage with our stakeholders in two-way communication. Listen to them and learn from them, and share our own views as well.

Finally on a personal note, what's the most important thing you do in your role as Chairman and CEO?

Well, you asked me that question last year – and this is one thing that hasn't changed. I've always seen my most important job to be doing everything I can to ensure the people of Ernst & Young wake up every morning with a personal sense of what is right and what is wrong. I want everyone in Ernst & Young to be confident that no matter what happens, nothing is more important than their own personal integrity and commitment to quality. If anything or anyone makes them uncomfortable, at a client or within Ernst & Young, I want them to know that it is not just okay for them to object, or raise their hand, or ask for assistance, it is their personal and professional obligation to do so.

6

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Gerald S. Ohn (217832)<br>Cotchett Pitre & McCarthy<br>840 Malcolm Road, Ste. 200<br>Burlingame, CA 94010 | *ENDORSED FILED* *(illegible stamp)* |

TELEPHONE NO.: 650-697-6000    FAX NO.: 650-697-0577

ATTORNEY FOR *(Name)*:

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102    FEB 18 2009 *(illegible stamp)* Clerk
BRANCH NAME:

CASE NAME:

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited<br>(Amount           (Amount<br>demanded         demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CGC-09-485137<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[X] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel     e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve          in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence     f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive

4. Number of causes of action *(specify)*: Please see attached.

5. This case [ ] is [X] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 2/19/08

Gerald S. Ohn (217832)
(TYPE OR PRINT NAME)                                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**    Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

<u>CITY OF AUBURN V. RICHARD S. FULD, JR.,ET AL.</u>

ATTACHMENT TO CIVIL COVER SHEET

CAUSES OF ACTION

1.   FRAUD AND DECEIT

2.   NEGLIGENT MISREPRESENTATION

3.   BREACH OF FIDUCIARY DUTY

4.   VIOLATIONS OF CALIF. CORP. CODE § 25400 *et seq.*

5.   VIOLATION OF § 11 OF THE SECURITIES ACT

6.   VIOLATION OF § 15 OF THE SECURITIES ACT

CASE NUMBER: CGC-09-485137  CITY OF AUBURN VS. RICHARD S FULD JR et al

## NOTICE TO PLAINTIFF

A Case Management Conference is set for

| | | |
|---|---|---|
| **DATE:** | **JUL-24-2009** | |
| **TIME:** | **9:00AM** | |
| **PLACE:** | **Department 212** | |
| | **400 McAllister Street** | |
| | **San Francisco, CA  94102-3680** | |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 3.221(c))



**Superior Court of California
County of San Francisco**

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can save time.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR encourages participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR is flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy.  Attorneys are encouraged to share this guide with clients.  By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

    1)    Judicial Arbitration
    2)    Mediation
    3)    The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

# JUDICIAL ARBITRATION

## Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony.  The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.  When the Court orders a case to arbitration it is called judicial arbitration.  The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.  Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration.  Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

# MEDIATION

## Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties.  It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process.  Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by BASF pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $250 per party administration fee, parties select a specific mediator from the list of approved mediation providers or BASF will help them select an appropriate mediator for the matter.  The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at **www.sfbar.org/mediation** or you may call BASF at 415-982-1600.

## Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

## Cost

Generally, the cost of Private Mediation ranges from $100 per hour to $800 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $250 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If the Court assigns a matter to the ESP, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

## Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

* * * * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA   94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO
400 McAllister Street, San Francisco, CA  94102-4514

|  |  |
|---|---|
| Plaintiff<br><br>v.<br><br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE<br>DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐ Private Mediation        ☐  Mediation Services of BASF        ☐   Judicial Mediation
☐ Binding arbitration                                                    Judge _____
☐ Non-binding judicial arbitration                                      Judge _____
☐ BASF Early Settlement Program
☐ Other ADR process (describe) _____

Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____

_____

| | | |
|---|---|---|
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| | | |
|---|---|---|
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

| | | |
|---|---|---|
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐  Plaintiff    ☐  Defendant    ☐  Cross-defendant | | Dated: _____ |

☐  *Additional signature(s) attached*

ADR-2  3/06                    STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION

CM-110

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*

**TELEPHONE NO.:**                    **FAX NO.** *(Optional):*
**E-MAIL ADDRESS** *(Optional):*
**ATTORNEY FOR** *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
**STREET ADDRESS:**
**MAILING ADDRESS:**
**CITY AND ZIP CODE:**
**BRANCH NAME:**

**PLAINTIFF/PETITIONER:**

**DEFENDANT/RESPONDENT:**

**FOR COURT USE ONLY**

| **CASE MANAGEMENT STATEMENT** | | **CASE NUMBER:** |
|---|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) | ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**

Date:                    Time:                    Dept.:                    Div.:                    Room:

Address of court *(if different from the address above):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1.  **Party or parties** *(answer one):*
    a. ☐ This statement is submitted by party *(name):*
    b. ☐ This statement is submitted jointly by parties *(names):*

2.  **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
    a.    The complaint was filed on *(date):*
    b. ☐ The cross-complaint, if any, was filed on *(date):*

3.  **Service** *(to be answered by plaintiffs and cross-complainants only)*
    a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
    b. ☐ The following parties named in the complaint or cross-complaint
       (1) ☐ have not been served *(specify names and explain why not):*
       (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*
       (3) ☐ have had a default entered against them *(specify names):*
    c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4.  **Description of case**
    a.    Type of case in ☐ complaint ☐ cross-complaint    *(describe, including causes of action):*

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐ Additional representation is described in Attachment 8.

9.  **Preference**
☐ This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐ The case has gone to an ADR process *(indicate status):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in *(check all that apply):*
     (1) ☐ Mediation
     (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
     (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
     (4) ☐ Binding judicial arbitration
     (5) ☐ Binding private arbitration
     (6) ☐ Neutral case evaluation
     (7) ☐ Other *(specify):*

   e.   ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
   f.   ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
   g.   ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

11. **Settlement conference**
     ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

12. **Insurance**
   a.   ☐ Insurance carrier, if any, for party filing this statement *(name):*
   b.   Reservation of rights:   ☐ Yes   ☐ No
   c.   ☐ Coverage issues will significantly affect resolution of this case *(explain):*

13. **Jurisdiction**
     Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
     ☐ Bankruptcy   ☐ Other *(specify):*
     Status:

14. **Related cases, consolidation, and coordination**
   a.   ☐ There are companion, underlying, or related cases.
       (1) Name of case:
       (2) Name of court:
       (3) Case number:
       (4) Status:
     ☐ Additional cases are described in Attachment 14a.
   b.   ☐ A motion to   ☐ consolidate   ☐ coordinate   will be filed by *(name party):*

15. **Bifurcation**
     ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

16. **Other motions**
     ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**
 a. ☐ The party or parties have completed all discovery.
 b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

 c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic Litigation**
 a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
 b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other Issues**
 ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**
 a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

 b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Case management orders**
 Previous case management orders in this case are *(check one)*:   ☐ none   ☐ attached as Attachment 21.

**22. Total number of pages attached *(if any)*: _____**

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.
Date:

_____   ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF PARTY OR ATTORNEY)

_____   ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF PARTY OR ATTORNEY)
                                      ☐ Additional signatures are attached

CM-110 [Rev. January 1, 2007]           **CASE MANAGEMENT STATEMENT**                    Page 4 of 4



# Superior Court of California
## County of San Francisco

**HON. DAVID BALLATI**
**PRESIDING JUDGE**

# Judicial Mediation Program

**JENIFFER B. ALCANTARA**
**ADR PROGRAM ADMINISTRATOR**

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable David J. Ballati | The Honorable Kevin M. McCarthy |
| The Honorable Anne Bouliane | The Honorable Maria J. Miller |
| The Honorable Robert L. Dondero | The Honorable John E. Munter |
| The Honorable Ernest H. Goldsmith | The Honorable Ronald Quidachay |
| The Honorable Harold E. Kahn | The Honorable A. James Robertson, II |
| The Honorable Patrick J. Mahoney | The Honorable John K. Stewart |
| The Honorable Tomar Mason | The Honorable Mary E. Wiss |
| The Honorable James J. McBride | The Honorable Charlotte Walter Woolard |

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated but specific request are not guaranteed. Please allow at least 30 days for scheduling. The court Alternative Dispute Resolution Program Administrator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

10/08 (mt)